Argued June 18, affirmed September 9, rehearing denied November 12, costs taxed November 18, 1924.

## STEPHEN RICHARDS *v.* PAGE INVESTMENT CO.

(228 Pac. 937.)

**Boundaries—Deed Designating Bank as Boundary Held not to Convey Land Between High and Low Water Mark.**

1. Deed of land adjacent to Willamette River designating boundary as commencing at bank and extending to bank, and thence along bank, *held* not to convey land between high and low water mark.

**Navigable Waters—Riparian Owner may Separate Riparian Rights from Upland.**

2. Upland owner, deriving title from general government, holding also title to lands between high and low water mark, derived from state, may separate riparian rights from upland.

**Boundaries—"Bank," Designating Boundary, Ordinarily Means High-water Mark.**

3. Ordinarily, term "bank," as used in deed to designate boundary of land adjacent to river, is synonymous with that high-water mark below which state originally had title.

**Navigable Waters—State Owner of Lands Under Water.**

4. State, as owner of original title to lands under Willamette River, between high and low water mark, did not have mere appurtenances to uplands but owned the lands under water.

**Navigable Waters—Tenants in Common of Upland Share in Land Between High and Low Water Mark.**

5. Tenants in common of land abutting on Willamette River shared in same proportion in land between high and low water mark granted to them by legislation of 1872 (Laws of 1872, p. 129) as amended by that of 1874 (Laws 1874, p. 76) and 1876 (Laws 1876, p. 69).

**Tenancy in Common—Title by Prescription of Tenant in Common Based on Notice of Hostile Possession.**

6. If one tenant claims title to whole tract in severalty and his acts and circumstances surrounding them give notice to cotenant of hostile possession with view of acquiring exclusive ownership of whole tract, claimant can acquire title by adverse possession against the cotenant.

**Tenancy in Common—Rule Stated as to Acts Necessary to Initiate Adverse Possession by One Tenant in Common Against Cotenants.**

7. To initiate adverse possession in favor of a tenant in common against his cotenants, there must be some act or declaration indicating hostile possession, or that one in actual possession intends to hold it to exclusion of other tenants.

---

2. Nature of riparian rights and lands to which they attach, see notes in 9 Ann. Cas. 1235; Ann. Cas. 1913E, 709; Ann. Cas. 1915C, 1026.

6. When adverse possession by one cotenant will create title by prescription, see note in 109 Am. St. Rep. 609.

7. Hostility as essential element in adverse possession, see note in 15 L. R. A. (N. S.) 1192.

See 2 C. J., §§ 100, 342; 6 C. J., § 2; 9 C. J., § 7 (1926 Anno.), 78; 22 C. J., § 1206; 25 Cyc., pp. 1267, 1268, 1269, 1271, 1417; 29 Cyc., pp. 356, 362 (1926 Anno.); 31 Cyc., p. 43; 38 Cyc., pp. 25, 27, 37.

**Tenancy in Common—Pleadings in Ejectment Held Notice of Adverse Possession.**

8. Where answer in ejectment by one claiming as cotenant against other alleged cotenants averred that defendants were owners of land in question and entitled to possession, there was sufficient notice of adverse possession to plaintiff to start ten year statute running.

**Boundaries—Deeds Conveying Land to River Held to Convey to Low-water Mark.**

9. Deeds conveying property abutting on stream "to the river" *held* to assume to convey to low-water mark.

**Adverse Possession—Deeds Conveying to River Held to Constitute Color of Title to Lands Between High and Low Water Mark.**

10. Deeds in chain of title conveying to river constituted color of title to land between high and low water mark in those holding under them, which was the assertion of adverse possession.

**Adverse Possession—Holdings Under Color of Title may be Tacked Together to Make Up Requisite Time.**

11. Holdings under color of title may be tacked together to make up length of time necessary to title by prescription.

**Evidence—Record Held Conclusive as to Contentions of Parties in Ejectment, Answer in Which Alleged to be Inception of Hostile Possession.**

12. Where, in action for partition, defendants set up title by adverse possession having its inception in declaration in answer by defendant's predecessor in title in former action of ejectment, *held,* that record of such suit was conclusive as to contentions therein in view of Section 328, Or. L.

**Pleading—"Pleading" Defined.**

13. "Pleading" is statement in logical and legal form of facts which constitute plaintiff's cause of action or defendant's ground of defense.

**Limitation of Actions—Statute not Tolled by Disabilities Arising After It Began to Run.**

14. Having once begun to run, statute of limitations is not tolled by disabilities subsequently arising.

**Limitation of Actions—Running of Statute in Favor of Tenant Asserting Adverse Possession Held not Interrupted by Subsequent Mental Incompetency of Cotenant.**

15. Where adverse possession by one tenant began on filing by him, in ejectment by cotenant, of answer asserting exclusive adverse possession as owner of fee-simple title, running of statute was not interrupted by plaintiff's subsequent mental incompetency.

**Limitation of Actions—Disability Ceasing to Exist in Time to Permit Suit Held not to Prevent Setting Up Bar of Statute.**

16. Disability existing at accrual of cause of action for recovery of land but ceasing to exist two years before expiration of additional time for suing given by Section 17, Or. L., because of such

disability and three years before death of owner, did not prevent setting up statute in partition by his successors.

**Limitation of Actions—Reply Setting Up Disability to Sue must Show Disability in Existence at Accrual of Cause of Action.**

17. In partition, reply to defense of adverse possession setting up disability to sue must show that disability existed at accrual of cause of action.

**Judgment—Judgment for Defendant in Ejectment Held not to Prevent Suit for Partition so as to Interrupt Running of Statute Against It.**

18. Judgment for defendant in ejectment between plaintiff's predecessor in title and defendant's predecessor in title *held* not to have prevented suit for partition so as to disable defendant from setting up, in subsequent suit for partition, adverse possession having its inception in assertions in pleadings in ejectment.

**Judgments—Obligation and Sanction of Judgment are Mutual.**

19. The obligation and sanction of a judgment are mutual and affect all parties thereto equally.

**Judgment—Judgment of Dismissal Held not to Lessen Effect of Pleadings in Ejectment as Constituting Inception of Hostile Possession.**

20. Judgment of dismissal founded on verdict for defendants in ejectment *held* not to lessen effect of declaration, in defendant's answer, of hostile possession as constituting inception.

From Multnomah: WALTER H. EVANS, Judge.

Department 1.

AFFIRMED.     REHEARING DENIED.

For appellant there was a brief over the names of *Messrs. Chamberlain, Thomas & Kraemer,* with oral arguments by *Mr. Warren E. Thomas* and *Mr. O. W. Eastham.*

For respondent there was a brief over the name of *Messrs McCamant & Thompson,* with an oral argument by *Mr. Wallace McCamant.*

BURNETT, J.—This is a suit wherein the plaintiff alleges that he is the owner of an undivided half and the defendant is the owner of the other moiety of a

certain tract of land and seeks to have the same partitioned between them.

By way of giving a history of his title he avers in his complaint that on July 25, 1862, James B. Stephens and wife conveyed to Joseph Knott a tract of land in Multnomah County described in the complaint as bounded on the west by the east bank of the Willamette River, the title to which Knott held one half for himself and one fourth for each of his two sons, Levi Knott and A. J. Knott; that by certain legislation in 1872 as amended in 1874 and 1876 the State of Oregon granted and confirmed to the owners of uplands abutting on the Willamette River all the land opposite such holdings between high and low water marks whereby Joseph Knott and his two sons became the owners in the proportions above mentioned of the property sought to be partitioned in this suit and that plaintiff is the successor in interest of Joseph Knott to the fee-simple title of one half and the defendant owns the other half formerly belonging to the two sons.

The premises here involved are thus described:

"A piece or parcel of land situate in Section No. 3, in Township No. 1 South, Range No. 1 East, of the Willamette Meridian, and more particularly described and bounded as follows: Beginning at the Northwest corner of a one acre tract of land (being the tract first hereinbefore described) formerly conveyed by J. B. Stephens to Joseph Knott, at a point 30 feet South of the South line of block No. 11 in East Portland (now within the corporate limits of the City of Portland) and 193 feet West of the East line of Water Street in said East Portland, and runing thence Southerly along the Westerly line of said one acre tract 262 feet (more or less) to a point 30 feet North of the North line of block No. 2 in Stephens Addition to said East Portland, and 164 feet West of the

East line of said Water Street; thence West (150 feet more or less) to the main ship channel of the Willamette River; thence Northerly along the main ship channel 262 feet (more or less) to a point directly West of the place of beginning; thence East to the place of beginning; subject to easements for street purposes, as now claimed by the City of Portland; and excepting any portion of the premises extending Easterly from said ship channel to ordinary low water mark of the Willamette River, and owned by the State of Oregon.''

As to this tract, the complaint declares that on December 28, 1882, Joseph Knott conveyed his undivided half thereof to W. H. Andrus who died seised thereof on August 6, 1902, leaving surviving him as his sole heir at law his daughter Daisy B. Andrus, now Daisy B. Eastham, the plaintiff's immediate grantor, and that the defendant is the owner of the other half.

The answer admits the conveyance, from Stephens to Joseph Knott and the latter's tenure of one half for himself and one fourth for each of his two sons and further admits that by the legislation mentioned ''the State of Oregon released and confirmed to said Joseph Knott, Andrew J. Knott and Levi Knott any and all right and title possessed by the State of Oregon in property'' described in the deed from Stephens to Joseph Knott. All the plaintiff's averments of an estate in himself in the realty involved herein are traversed by the answer.

In its answer the defendant alleges that on March 1, 1877, Joseph Knott conveyed to his two sons, A. J. Knott and Levi Knott all the land deeded to him by Stephens using the same western boundary employed by the latter, to wit, the bank of the Willamette

River and the execution and delivery of this convey-ance is admitted by the plaintiff.

In substance, concerning the deed of Joseph Knott to his sons, the contention of the defendant is that its legal effect was to carry with it not only the upland extending to the bank of the river, as expressly stated therein, but also, by operation of law, the space west of the river bank, in front of the described upland and extending to low-water mark, which space, as the pleadings admit, was granted and confirmed by the state to the three Knotts as the then owners of the upland.

On the other hand, the plaintiff maintains that by the proper legal construction thereof nothing was included in that deed outside of the specified bound-aries mentioned therein, with the result that the father conveyed to the sons nothing west of the bank or high-water mark of the river, leaving them as owners together of only one half thereof.

Further defending, the answer narrates in sub-stance that on March 1, 1877, Joseph Knott, from whom the plaintiff claims to deraign title, made, exe-cuted and delivered to his two sons two deeds whereby he undertook to transfer to the sons all his estate in both tracts described in the complaint, to wit, the upland and the parcel of which the plaintiff seeks partition; that the sons immediately took possession of both tracts; that by mesne conveyances the de-fendant has succeeded to the title claimed by the sons under those two deeds and that the defendant and its predecessors in interest continuously since March 1, 1877, have been in the open, hostile, noto-rious and exclusive possession of the tract sought to be partitioned, claiming to own the same in severalty, asserting such claim against W. H. Andrus, his sole

heir, Daisy B. Eastham, and her grantee the present plaintiff. In this affirmative defense the answer further recites that on December 17, 1884, W. H. Andrus, the present plaintiff's predecessor in interest in the parcel here involved, claiming by the same title the plaintiff now asserts, instituted an action in the Circuit Court of Multnomah County in which he demanded possession of the property; that on January 17, 1885, A. J. Knott and Levi Knott filed an answer in said action denying that Andrus had any interest in said tract and alleging that they themselves were the owners in fee simple thereof. The answer herein then goes on to state that on March 19, 1888, Andrew J. Knott and wife, together with the heirs and successors in interest of Levi Knott, then deceased, for the consideration of $9,000 made, executed and delivered to James B. Stephens their warranty deed by which they conveyed to said Stephens the following described real property situated in Multnomah County, Oregon, to wit:

"Commencing 30 feet south of the southeast corner of Block 11 in the City of East Portland; thence south along the west line of Water Street in said East Portland to U Street; thence west down U Street to the Willamette River; thence north down said River to within 30 feet of the south boundary line of block 11; thence east parallel to and 30 feet distant from the south boundary line of Block 11 to the place of beginning; containing one-half acre, more or less, including all riparian rights in the river in front of said land."

and that this deed was recorded in the deed records of Multnomah County and the property therein described and conveyed expressly covered the realty here involved. The answer goes on to aver the execution and delivery of the following deeds to the prop-

erty by the description last above set out at the dates
and for considerations as follows:

James B. Stephens to Frederick H. Page, February
20, 1889, consideration $15,000; Frederick H. Page
to William G. Steel, September 20, 1892, considera-
tion $30,750; William G. Steel to James Steel and
George A. Steel, September 20, 1892, consideration
$35,000; George A. Steel and James Steel to Mary L.
Steel, March 1, 1893, consideration $40,000; Mary L.
Steel to James H. Page, November 17, 1896, con-
sideration $25,000; James H. Page to this defendant,
June 5, 1909, consideration not stated; that all said
deeds were seasonably recorded and were joined in
by the respective spouses of the grantors. Thus far
the allegations of the answer about the claim of con-
veyances extending from Stephens as grantee of
A. J. Knott and heirs of Levi Knott to this defendant
are admitted in the reply. The execution of the deed
from the Knotts to Stephens is likewise admitted but
that it covered the land in dispute is denied. Con-
tinuing, the answer relates that beginning in 1898,
James H. Page, as the owner, leased the entire prop-
erty involved to various and successive tenants all of
whom attorned and paid rent to him until his trans-
fer of the tract to this defendant to whom afterwards
such tenants continued to attorn until the filing of
the answer; that the tenants occupied the property
exclusively and openly down to the ship channel in
the river, putting the same to various uses such as a
shipyard, railway dock, woodyard, and steel works;
that neither the plaintiff nor any of his predecessors
in interest have ever demanded from the defendant
any accounting for the rents and profits collected
by the latter for the use of the property nor offered
to pay any of the taxes thereon; that the defendant in

the years 1918 and 1919 constructed a fill on the property at an expense of $11,000 thereby greatly increasing its value; that otherwise, owing to the growth of the City of Portland, it has advanced in value; that the Knotts, father and sons, Stephens, James H. Page, George A. Steel and James Steel, all of whom were familiar with the transactions about the property upon which the defendant relies, are all dead, in consequence of which the plaintiff's claim is stale.

For a third and separate defense as an estoppel against the plaintiff's assertion of title the answer alleges that on December 17, 1884, W. H. Andrus, the plaintiff's predecessor in title, commenced an action of ejectment against one H. Hogue wherein Andrus averred that he was the owner in fee simple and entitled to the possession of the premises here in question which Hogue was withholding from Andrus to his damage in the sum of $500; that Hogue answered on January 5, 1885, avowing his possession of the land as the tenant of A. J. Knott and Levi Knott who, upon allowance of their application to be made defendants in said action, answered denying all the allegations of the complaint of Andrus and averred that they themselves were the owners in fee simple of the property; that issue was joined by the reply, a trial had resulting in a verdict for the defendants upon which a judgment was rendered in their favor, which was affirmed in the Supreme Court of the State of Oregon and that the mandate of that court was entered in the Circuit Court December 11, 1885.

The reply admits the history of the action of ejectment, as thus stated, but denies the identity of the property and the legal effect of the judgment as an estoppel as claimed for it by the defendant. The reply also admits that the plaintiff claims in this

suit as the successor of Andrus and that the defendant here has succeeded to the rights of A. J. Knott and Levi Knott in the property in controversy.

Combating the assertion of the answer "that the claim of the plaintiff is stale and that the suit brought by the plaintiff is barred by the statute of limitations," the reply contains the following allegation:

"that plaintiff's predecessor in interest, W. H. Andrus, who acquired the property in controversy in the year 1882, and under whom plaintiff claims, became severely ill in mind and body, in the year 1885, and from that time to the date of his death had no knowledge of his business affairs; that the County Court of this County, in the year 1888, adjudged him mentally incompetent and appointed a guardian of his person and estate, which guardianship continued until near the time of his death; that said guardian had no knowledge of the rights of said W. H. Andrus in the real property involved in this controversy and made no mention or account thereof in the proceedings of guardianship; that the only member of the family of said Andrus living at the time he became ill as aforesaid, in the year 1885, was his daughter, Daisy B., plaintiff's grantor, then eleven years of age; that she never received any information or had any knowledge concerning her right, title or interest in the premises in controversy until late in the year 1920, and plaintiff had no knowledge concerning the same until the present year. And plaintiff alleges that the interest and estate claimed by him and predecessors in the premises has been a matter of public record since the year 1883, and known to defendant and predecessors in interest ever since that date; and they have remained silent, contrary to their duty as cotenants, and have concealed from plaintiff and his predecessors in interest all matters affecting the common title and estate, and defendant ought not to be heard to say now, and is estopped to say, that plaintiff's claim is stale or inequitable."

As to the answer urging as an estoppel the judgment in the ejectment action of *Andrus* v. *A. J. and Levi Knott* substituted as defendants for their tenant H. Hogue, the reply imputes to Joseph Knott the ownership on March 1, 1877, of an undivided half and to his two sons the ownership at that time each of an undivided one fourth of the premises here involved and avers that on December 17, 1884, having purchased the share of Joseph Knott therein, Andrus instituted the action of ejectment already mentioned in which the two sons became the actual defendants. The reply then goes on to state, in substance, that at the trial of that action the defendants Knott successfully contended that Andrus could not maintain the action because he was a tenant in common of the premises with them and they had never denied his right to occupy the same with them; and further that they also successfully maintained that the outstanding title therein, superior to that of any of the parties to the action, was in the State of Oregon on account of all which the defendants there "defeated and deprived the said Andrus, under whom plaintiff claims, of the real property then and now in controversy." The reply also avers that, by reason of those representations and contentions, the Knotts and their successors caused Andrus and those claiming under him to desist and refrain from asserting any right or title to any of the realty then or now in controversy, whereby the Knotts and their successor, the present defendant, are estopped to assert adverse possession in themselves.

On the issues thus formed there was a trial which resulted in a decree dismissing the complaint declaring the defendant to be the owner of the property in dispute and entitled to the possession thereof and

quieting the defendant's title thereto.   The plaintiff appealed.

1, 2. The first question to be considered is the effect upon the land here in dispute of the deed from Stephens and wife to Joseph Knott, dated July 25, 1862.   The description in that deed is here set down:

"A certain piece, parcel or tract of land, being that portion of the Land Claim of the aforesaid James B. and Elizabeth Stephens, in Section 3, Township 1 South, Range 1 East; commencing on the right bank of the Willamette River, on the North side of a cotton-wood tree five (5) inches in diameter and 30 feet south of the South line of block No. 11 in East Portland, thence East and parallel with the streets of said town plat, 193 feet to a point 30 feet South of the Southwest corner of block No. 12; thence South on an extension of the East line of Water Street, 260 feet; thence West 164 feet to the bank of the River; thence by the bank of the River 262 feet to the place of beginning, containing 1.06 acres."

The land sought to be partitioned in this suit abuts upon the land in the Stephens-Knott deed and extends between the bank and low-water mark.   Even if the original title of Stephens had covered both tracts, it would have been competent for him to convey to Knott a part thereof bounded upon the west by the bank of the river.   The bank is a fixed line, capable of definite location.   He would have had a right, if he had owned both tracts, to separate them, although he had derived from the general government the title to the upland and from the state that lying west of the bank, or below high-water mark.   As stated by Mr. Justice Eakin in *Grant* v. *Oregon Nav. Co.*, 49 Or. 324, 329 (90 Pac. 178, 180):

"It is within the power of the riparian owner to separate the riparian rights from the upland, and in

every case it would be a question of the intention of
the parties whether it has been so separated."

3, 4. The language of the description in the deed is
plain that it reaches only to the bank of the river.
Ordinarily the term "bank" is synonymous with that
high-water mark, below which the title was originally
in the state, and not in the general government. The
state as the power of the original title did not have
a mere appurtenance. It had the land between high
and low water marks, and it is that land about which
the present parties are contending. It is true that
the principle that land cannot be appurtenant to
other land is subject to exception, but these depar-
tures from the general rule are founded upon some
particular use to which the so-called appurtenant
land has been devoted as subservient to other realty.
For instance, in *Putnam* v. *Putnam,* 77 App. Div. 554
(78 N. Y. Supp. 987), a strip of land was set apart
by referees in partition as appurtenant to other
tracts to be used in common by the several owners of
those tracts as a way of ingress and egress, and
it was held under those circumstances that the strip
to be so used was appurtenant in common to both
tracts, could not be partitioned in a subsequent suit
between successors in interest and passed by a con-
veyance which included "appurtenances." The New
York authorities like *New York Central & H. R. R.
Co.* v. *Matthews,* 144 App. Div. 732 (129 N. Y. Supp.
828), are based upon a peculiar New York statute re-
lating to the authority of the State Land Commis-
sioners. The enactment reads thus in part:

"No grant of lands under water shall be made to
any person other than the proprietor of the adjacent
lands, and any such grant made to any other person
shall be void."

In a case where the railroad company sought to condemn the land below low-water mark, it was held under this statute that the owner of the adjacent upland was a proper defendant in the suit to condemn the overflowed lands lying in front of the upland. The court there said:

"The right or privilege conferred by the statute is appurtenant to the upland and vests in the owner thereof and it never can exist severed from such ownership," citing *Blakslee Mfg. Co.* v. *Blakslee Sons Iron Works,* 129 N. Y. 155 (29 N. E. 2).

Our statute is not so drastic as that of New York just quoted. Only a mere preferential privilege of buying tide and overflowed lands in front of upland was ever granted to any upland owner in Oregon. It is true that by the legislation of 1872 as amended by that of 1874 and 1876, in this state as construed by this court in *Pacific Elevator Co.* v. *Portland,* 65 Or. 349 (133 Pac. 72, 46 L. R. A. (N. S.) 363), the title of the state to lands in the Willamette River lying between high-water mark and low-water mark was granted to the adjacent upland owners, but no construction of those acts has made such lands merely appurtenant to the upland so that conveyance of the latter by metes and bounds would carry the former by implication. Indeed, the language of such cases as *Grant* v. *Oregon Navigation Co., supra,* is directly opposed to such construction, and there is nothing in the language of either of the statutes referred to indicating that such was the purpose of the legislative assembly. We conclude therefore that the utmost effect of the deed from Stephens to Joseph Knott was to convey to the latter the upland bounded on the west by the bank of the Willamette River.

5. As Joseph Knott confessedly by the pleadings was a tenant in common with his two sons of the upland, the effect of the legislation alluded to as construed by the Pacific Elevator case was to confer upon those tenants in common in the same proportions the title to the land now in dispute, and sought to be partitioned herein. Defendant's ownership as the successor in interest of A. J. and Levi Knott is conceded by the pleadings. Both parties admit that at one time Joseph Knott and his two sons were the owners as tenants in common of the lands in controversy here, the same being that portion of the land between high and low water marks abutting upon and lying west of the original tract owned by and deeded to Joseph Knott.

6. The principal question in the case, therefore, is whether or not the sons and their successors in interest have acquired title to the whole tract here in controversy by prescription. True enough, ordinarily it is the rule of law that the possession of one tenant in common inures to the benefit of all his cotenants. It is equally true, however, that if one tenant claims the title to the whole tract in severalty and the acts of the claimant and the circumstances surrounding them bring home to the cotenant notice that the possession exercised by the claimant is hostile with view of acquiring the exclusive ownership of the whole tract, the general rule is obviated. In other words, under apt circumstances, it is as possible for a tenant in common to acquire title to the whole tract in severalty by prescription as it is to acquire such a title from one as to whom no privity of estate exists. In *Chauncey* v. *Wollenberg,* 59 Or. 214, 219 (115 Pac. 419, 421), Mr. Justice MOORE quoted with approval

Freeman on Cotenancy, Section 447, given in an extract from *Florence* v. *Hopkins*, 46 N. Y. 186:

"But even the possession of one of the tenants in common may become adverse by acts of his amounting to an exclusion of his cotenants; and if he convey the whole of the premises to a third party, and the purchaser takes actual possession, claiming the whole, it is certain that the possession of such purchaser is adverse, and is not the possession of the former cotenants of his grantor. The moment such adverse possession commences, the holding in common is terminated, and, until the excluded parties regain their possession by the appropriate action, I do not see how they can bring themselves within the provision of the statute or the rule of the common law." See, also, *Crowley* v. *Grant*, 63 Or. 212 (127 Pac. 28).

7. The substance of the rule is that in order to initiate adverse possession in favor of one cotenant against the others, there must be some act or declaration indicating that the hostile flag has been raised or that the one in actual possession intends to hold the same to the exclusion of the other tenants in common.

8. In this case it is admitted by the pleadings that on December 17, 1884, W. H. Andrus, the plaintiff's predecessor in title, commenced an action of ejectment against H. Hogue to recover the possession of the land here in dispute. In that action Andrus, the avowed predecessor in interest of the plaintiff here, alleged that he was the owner in fee simple and entitled to possession of the tract now in controversy, and that the defendant wrongfully withheld the same from the plaintiff. Hogue, the first defendant, avowed his possession stating that he was the tenant of Levi Knott and A. J. Knott, the sons of Joseph Knott. The two Knott brothers were then made defendants in the action and answered denying that the plaintiff

Andrus was the owner in fee simple or entitled to possession of the realty there in controversy or any part thereof, and for a further and separate answer alleged,

"That they are the owners in fee simple of said land, and of every part thereof, as tenants in common, each owning an undivided half of the same, and that they are entitled to the possession thereof."

In that action the verdict was for the defendant and the judgment was

"that the plaintiff's action be dismissed and that the defendants have and recover of and from plaintiff their costs and disbursements herein," etc.

Irrespective of the effect of that judgment, whether to declare the Knotts to be the owners of the land or merely to dismiss the action, there is nothing therein to controvert or to lessen the effect of the declaration in the answer of the Knotts, that they themselves were the owners in fee simple of the entire tract and that the plaintiff Andrus was not the owner, nor was he entitled to the possession thereof. In that case both Andrus and the Knott brothers announced in most specific terms that the permises were held adversely to Andrus. No plainer notice of a hostile and exclusive possession could have been formulated. The ten years' adverse possession which ripens into a title in fee simple under such cases as *Caufield* v. *Clark*, 17 Or. 473 (21 Pac. 443, 11 Am. St. Rep. 845), was initiated at that time if not earlier.

9. The answer of the Knott brothers in that case was filed January 17, 1885. Without substantial controversy, the evidence is that Andrew J. Knott, joined by his wife and heirs and successors in interest of Levi Knott, then deceased, did on March 19, 1888,

convey to James B. Stephens the land here involved, by the following description:

"Commencing 30 feet south of the southeast corner of Block 11 in the City of East Portland; thence south along the west line of Water Street in said East Portland to U Street; thence west down U Street to the Willamette River; thence north down said River to within 30 feet of the south boundary line of block 11; thence east parallel to and 30 feet distant from the south boundary line of Block 11 to the place of beginning; containing one-half acre, more or less, including all riparian rights in the river in front of said land."

It is admitted by the pleadings that, by this description, the property was conveyed from Stephens to Frederick H. Page on February 20, 1889; from Page to William G. Steel on September 20, 1892; by William G. Steel on the same date to George A. Steel and James Steel; by George A. Steel and James Steel to Mary L. Steel on March 1, 1893; by Mary L. Steel and James Steel, her husband, to James H. Page on November 17, 1896; and by James H. Page to the defendant, the Page Investment Co., June 5, 1909, and that ever since that date, the defendant has been in the exclusive possession of the property. All these conveyances were seasonably recorded imputing notice of the transactions to all persons concerned.   Indeed, it is said in the brief of the plaintiff on page 57,

"We admit the occupancy of the premises in dispute, in conjunction with the upland admittedly owned by defendant, during a period of more than twenty years preceding the commencement of this suit.   Conceding this, as we have from the beginning, the great mass of evidence in that connection is of importance only as it relates to the character of the occupancy."

The evidence is clear that, beginning in the year 1898, James H. Page leased the premises to the Johnson Shipyard Company, which carried on a shipbuilding industry on the premises as the lessee of James H. Page; that after the occupancy by the Johnson Shipyard Company, and with its consent, the Portland City & Oregon Railway Company took a lease of the premises for ten years, from and after September 18, 1901. The lease was assigned to the Oregon Water Power & Railway Company on July 1, 1902. The assignee took possession of the premises and remained there, using it for railway purposes until September 1, 1906, when it was succeeded by the Portland Railway, Light & Power Company which took possession and remained there until 1911. All these tenants attorned and paid to James H. Page the rent of the premises. After the conveyance by Page to the present defendant, the Portland Railway Light & Power Company attorned to this defendant and paid its rent accordingly. The Portland Railway, Light & Power Company constructed a dock on the premises. After the expiration of its lease the defendant leased the property to the Standard Wood Yard and thereafter to the Overmire Steel Company, and the Overmire Steel Company was in possession of the property at the beginning of this suit. The occupancy of the premises was open and notorious to all observers from the year 1898, continuously following.

As noted above, the description in all these deeds runs "to the river." According to the theory of plaintiff, when the Knott brothers on March 19, 1888, conveyed the controverted premises to Stephens, they were the tenants in common of the same with Andrus. The deed of the Knotts to Stephens pur-

ports to convey the whole estate in the property and not any part thereof. In commenting on the effect of the deed from Joseph Knott to his two sons, dated March 1, 1877, the plaintiff quotes from *Stevens* v. *King,* 76 Me. 197 (49 Am. Rep. 609), as follows:

"The shore of a pond, being the space between high and low water, necessarily has two sides, a high-water side and a low-water side; and land bounded by the shore may be bounded by the high-water side or the low-water side. If the side lines of a parcel of land, starting back from the pond, run to the shore and there stop, and the line between these two points runs along the shore, of course the land will be bounded by the high-water side of it. But if the side lines are described as running to the pond, the result will be otherwise."

In his discussion, also, the plaintiff quotes Or. L., Section 878, subdivision 5:

"When tidewater is the boundary, the rights of the grantor to low water mark are included in the conveyance, and also the right of this State between high and low water mark."

The argument goes on to state that

"An example of what is meant by subdivision 5 would be a grant of land within given bounds extending west to the Willamette River. In such a case, the westerly boundary is not definitely fixed and the statute, which is a rule of evidence (*Astoria Exchange Co.* v. *Shively,* 27 Or. 104, 109 (39 Pac. 398, 40 Pac. 92) declares the intent of the grantor to convey anything he may own to low water mark."

10, 11. The effect of the deeds from the Knott brothers to Stephens and those of their successors in interest constituting a chain of title extending to the defendant is that they all assume to convey the property to low-water mark. These deeds constitute color

of title in those holding under them and such holdings may be tacked together to make up the length of time necessary in title by prescription: *Vance* v. *Wood*, 22 Or. 77 (29 Pac. 73). Within the meaning of the language quoted from *Chanucey* v. *Wollenberg*, *supra*, this constituted the assertion of adverse possession which, as we have shown, was brought to the notice of Andrus under whom the plaintiff claims by the express declaration of the Knotts in their answer in the action of ejectment brought by Andrus.

12, 13. The plaintiff also urges that in the case of *Andrus* v. *Knott*, the defendants there successfully contended that Andrus could not maintain his action because he was a tenant in common with them and that they had not denied him the right as such to occupy with them and, further, that their additional contention was that the outstanding title to the premises then in controversy, superior to that of either of the parties to the action, was in the State of Oregon. As to the contentions of the parties there, we must have recourse to the record of them in that case. The complaint there which is in evidence here says:

"That plaintiff is the owner in fee simple and entitled to the possession of the following described real property (the realty here involved);

"That the defendant wrongfully withholds the said tract of land above described from the plaintiff to his damage in the sum of five hundred dollars."

The answer of the Knotts was a denial. .

"That plaintiff is the owner in fee simple, or at all or is entitled to the possession of the property described in said complaint, or any part of it.

"Deny that defendants wrongfully withhold the said tract of land, or any part of it, from plaintiff

to his damage in the sum of $500 or any sum whatever.

"And for a further and separate answer and defense hereto, defendants allege that they are the owners in fee simple of said land, and of every part thereof, as tenants in common, each owning an undivided half of the same. And that they are entitled to the possession thereof."

Testing the question about what the contentions of the parties really were, we have recourse to the old definition of pleading:

"Pleading is the statement in a logical and legal form of the facts which constitute the plaintiff's cause of action or the defendant's ground of defense. It is the formal mode of alleging that in the record which would be the support of the action or the defense of the party in evidence." 6 Words and Phrases, 6409.

We read in Section 328, Or. L., that

"The defendant shall not be allowed to give in evidence any estate in himself or another in the property, or any license or right to the possession thereof unless the same be pleaded in his answer."

These rules measure what in fact, as disclosed by the record, were the contentions of both parties to that action and the record must be held to be conclusive on that subject.

Since it is alleged by the plaintiff and affirmed by the defendants, it must be indisputably true that at that time the defendants Knott, by their tenant Hogue, were holding the property adversely to the present plaintiff's predecessor in title, W. H. Andrus. It is true that in combating the argument of the then plaintiff's brief, the Knotts argued that if the hypothesis of the plaintiff was that he was a tenant in common, he had not alleged anything to show an ouster by his cotenants. In the same manner, the theory of the defendant's brief was in answer to the

112 Or.—34

hypothesis advanced by the plaintiff that the title might be in the State of Oregon. Otherwise, even in argument, the defendants there contended as the present defendant urges, that the land in dispute between high and low water marks was appurtenant to the upland of which, confessedly, they were the owners by the deed from their father. The present plaintiff in his reply says that by virtue of the contentions he imputes to the defendants in the ejectment action, they

"defeated and deprived said W. H. Andrus under whom plaintiff claims, of the real property then and now in controversy."

As to that, if the effect of the contention as thus pleaded was to deprive Andrus of the property, that effect must have arisen from and been reflected in the final judgment in that action, which is conclusive between the parties and their successors: Or. L., § 756. If he was deprived of the property then, however erroneous the judgment by which that result was accomplished, he and his successors remain deprived of it even to the present day.

14, 15. "But," says the plaintiff in his reply, "Andrus (under whom I claim) became severely ill in mind and body in the year 1885, and from that time to the time of his death, had no knowledge of his business affairs." This statement is not sufficient to accomplish the design of the pleader to take his case out of the effect of the statute of limitations, or to remove the case from the consequences of the adverse possession and hostile declaration of title evidenced by the answer of the Knotts in the ejectment action. For all that appears in the excerpt from the reply which has just been quoted, Knott's sickness did not commence until after the conclusion

of the action in ejectment. The statute began its operation and the adverse possession began on the filing of the answer in which the Knotts asserted exclusive adverse possession as the owners of the fee-simple title. Having once begun to run, the statute is not tolled by disabilities subsequently arising. Section 17, Or. L., reads thus:

"If any person entitled to bring an action mentioned in this chapter or to recover real property, or for a penalty or forfeiture, or against a sheriff or other officer for an escape, be at the time the cause of action accrued, either:

"1. Within the age of twenty-one years; or

"2. Insane; or

"3. Imprisoned on a criminal charge, or in execution under the sentence of a court for a term less than his natural life.

"The time of such disability shall not be a part of the time limited for the commencement of the action, but the period within which the action shall be brought shall not be extended more than five years by any such disability, nor shall it be extended in any case longer than one year after such disability ceases."

The testimony does not show that Andrus was insane. On the contrary, his daughter, the only witness speaking on that subject, says on cross-examination that he was not insane. The reply says he was "adjudged mentally incompetent" in 1888 and placed under guardianship; but it was admitted by the plaintiff at the trial that the guardian was discharged January 20, 1898. This would seem to remove whatever disability may have existed and restore the operation of the statute, even if it had been interrupted.

16. Even on the theory that Andrus was insane in January, 1885, when the Knotts filed their answer

asserting exclusive ownership of the tract in themselves, that disability would add only five years to the ten years of the statute totaling fifteen years ending in 1900. As his disability ceased on the discharge of his guardian in January, 1898, the operation thereof would not be prolonged beyond one year thereafter or January, 1899, yet the record discloses that he did not die until August 6, 1902. He thus had more than two years before his death in which he was competent to act in his own proper person and sue in partition as his successors have attempted to do. From every standpoint, therefore, the plaintiff is concluded by the statute.

17. For any disability of Andrus to have the effect of barring the statute from operation, it should have been alleged that such disability was in existence when the cause of suit arose, that is, when the Knotts answered claiming exclusive title in themselves. The rule is thus laid down in 25 Cyc. 1267:

"When the statute once begins to run it will continue unless there is a saving qualification in the statute, and as a general rule it is the settled construction of the statutes of limitation both in England and the United States that when a right of action has accrued, and there are parties competent to sue and be sued at that time, the period of limitations begins to run, and the time will continue to run notwithstanding any subsequent disability, and the provisions suspending the operation of limitations, in favor of infants, idiots, insane persons, married women, etc., or extending the period in favor of such persons, are confined to such disabilities existing at the time the cause of action accrues to such person. * *

"The foregoing general rule against the interruption of the statute of limitations after it has started to run is not confined to causes which accrue originally to the person whose disability intervenes.

If there are successive owners of a cause, or of equitable relief, and the right to prosecute arises in the time of the first, the period of limitation commences at that time and continues attached to the demand during the successive changes without regard to the disability of any of the successors. If the right or cause accrues to the ancestor and the statute commences to run against him, the disabilities of those to whom his right passes at his death will not interrupt the running of the statute, subject to the particular provisions of some of the statutes fixing a limit of time after the death of the ancestor, after which the heir or successor will be barred. * *

"Disabilities, to bring a party within the exceptions of the statute, cannot be piled one upon another, but a party claiming the benefit of the exception can only avail himself of the disability existing when the right of action first accrued.

"When a disability existing at the time the right of action accrued has been removed, the time cannot be enlarged and extended by adding to it a subsequent intervening disability."

So far as the reply shows, Andrus was mentally competent to care for his own affairs when the Knott brothers raised the hostile flag by their answer in the ejectment case, asserting exclusive adverse title in themselves. Indeed, by his complaint in that very action, Andrus himself asserted the adverse holding by the tenant of the Knotts.

18, 19. The plaintiff further urges that the effect of the judgment for the defendant in the ejectment action of *Andrus* v. *Knott,* 12 Or. 501 (8 Pac. 763), was to close the courts against Andrus and his successors until the decision of *Pacific Elevator Co.* v. *Portland, supra,* and he avows that they were effectively denied a forum in which the property right could be asserted. Conceding a construction to the judgment for the defendants as favorable as possible

to the plaintiff here, namely, that the defendant Knotts were not holding adversely but merely as tenants in common, the courts were then open to Andrus as they have remained ever since then, to commence his suit in partition. It is also urged that the case is covered by Section 20, Or. L., reading thus:

"When the commencement of an action is stayed by injunction ·or a statutory prohibition, the time of the continuance of the injuction or prohibition shall not be a part of the time limited for the commencement of the action."

In the first place, there is no injunction disclosed in any of the court proceedings from the beginning hitherto, neither is there any statutory prohibition involved. The decision of *Andrus* v. *Knott,* whether correct or erroneous, was the determination of a court having jurisdiction of the persons and of the subject matter before it. However it was decided, it is conclusive as to the matter directly determined: Or. L., § 756.

It would be intolerable if whenever, in after years, an opinion should be rendered not wholly in accord with some legal precedents, every antecedent judgment in other cases involving a similar question should thereby automatically be set aside. The decision of the Pacific Elevator case was a determination of the rights of other parties in other realty and having no estate in the property here involved. No injunction or statutory prohibition within the meaning of the law can be found in any of the opinions in *Andrus* v. *Knott* or the *Pacific Elevator Co.* v. *Portland.* The situation is quite different from that involved in *Morgan's Estate,* 46 Or. 233 (77 Pac. 608, 78 Pac. 1029), cited by the plaintiff in his supplemental brief. That case construed together the statute of limita-

tions and the proviso in the law relating to the settlement of estates, forbidding a suit on a claim against an estate until six months after the granting of letters of administration, and held that the latter statute extended the time prescribed in the former. *Frink* v. *Hoke,* 35 Or. 17 (56 Pac. 1093), merely held that while a proceeding was pending in the United States Land Office relating to the disposition or sale of government land, a court of this state could not take jurisdiction of the same. As stated by Mr. Chief Justice WOLVERTON:

"When the case was formerly here, it was determined that, as there was a controversy pending before the Land Department of the United States touching the relative rights of the parties to the patent to said land, this court would not entertain jurisdiction to settle the dispute under the contract until after that tribunal had decided the matter before it. It is clear, therefore, that the statute of limitations could not run in favor of Thomas until such time as plaintiffs were entitled to institute a suit in this jurisdiction with a view of ascertaining the relative rights of the parties touching the land under the contract."

The doctrine of that case is referable to the conditions of the act under which the State of Oregon was admitted to the Union, one of which was that

"Said state shall never interfere with the primary disposal of the soil within the same by the United States, or with any regulations Congress may find necessary for securing the title in said soil to *bona fide* purchasers thereof." 1 Or. L., pp. 27, 29.

In the legislation effecting the admission of the state into the Union was found the statutory prohibition within the meaning of Section 20, Or. L. The present case does not in any respect fall within the

terms of Section 20, Or. L. If the judgment in *Andrus* v. *Knott* operated against the plaintiff and his predecessors in interest, it likewise operated in favor of the defendants there, and those who came after them in title. The obligation and sanction of a judgment are mutual and affect all parties to the same equally. The decision of *Pacific Elevator Company* v. *Portland,* being a determination among those who are strangers to the present record, did not operate to confer any new or different title upon the plaintiff or any of his predecessors in interest. The decision of *Andrus* v. *Knott,* moreover, did not undertake to change the relation of the several parties as between themselves respecting the land in dispute, irrespective of who might have paramount title. Notified as he was by the avowed declaration of the Knotts that they were the owners in fee simple of the title and that they were holding adversely to him, which adverse possession he avowed in his complaint, Andrus and his successors must be bound by the consequences of that situation. In that action he sought to recover the land as the exclusive owner thereof in severalty. He failed in his attempt. Thereafter continuously until the commencement of this suit, more than thirty years afterwards, neither he nor those claiming under him made any assertion of interest or title of any kind in the premises, although at all times during that period it was as competent to sue in partition as when they did sue. Had he gained possession he might, as the Knotts did, have maintained it adversely long enough to acquire title by prescription, but he did not. On the contrary, we find the Knotts and their successors in title conveying the whole estate in the land, including in the conveyance the property running to the river. We find them and their tenants

occupying the property exclusively, and putting valuable improvements thereon, beginning in the year 1898 and continuing to the present time. Every act of ownership or dominion over the premises of which the record gives any history was performed by the Knott brothers and their successors. All these things were notifications of the adverse holding which was initiated and avowed by the Knotts. The statute began its operation at least when this hostile holding was announced in the answer of the Knotts. Nothing is shown by the record to interrupt that operation and it would be contrary to the law as well as inequitable after this long lapse of time since 1885 until the commencement of this suit on February 5, 1921, during which time valuable improvements have been added to the land, and it has risen greatly in value, to allow the plaintiff to buy up a claim for a mere nominal consideration and prevail in this proceeding.

20. It is not necessary further to consider the effect of the judgment in *Andrus* v. *Knott* more than to say that it did not in any way lessen the effect of the hostile declaration of title embodied in the answer of the Knotts therein.

The decree of the Circuit Court is affirmed.

AFFIRMED.   REHEARING DENIED.   COSTS TAXED.

RAND, McCOURT and COSHOW, JJ., concur.