Argued May 20, affirmed June 17, 1964

# PURVINE ET UX *v.* HATHAWAY ET UX

393 P. 2d 181

*Robert Mix,* Corvallis, argued the cause and submitted briefs for appellants.

*LaVerne M. Johnson,* Corvallis, argued the cause for respondents. On the brief were Thomas & Johnson, Corvallis.

Before McALLISTER, Chief Justice, and PERRY, O'CONNELL, DENECKE and LUSK, Justices.

O'CONNELL, J.

This is a suit in equity brought under ORS 105.705 to establish a boundary line between the lands of plaintiffs and defendants. Plaintiffs appeal from an adverse decree.

The land in dispute borders on the Willamette river. Defendants rest their claim to the land in question upon two grounds: (1) that the land consisted of accretions built up by the gradual movement of the river; (2) that title was acquired by adverse possession through actual possession of all the land or by adverse possession of a part of the land coupled with color of title.

Originally the Willamette river flowed in two principal channels, one to the west and the other to the east of the Hogue Donation Land Claim. These two channels were connected by a stream 66 feet in width known as Hogue creek. In 1869, when the water flowed as just described, Hogue conveyed the northerly part of his claim using Hogue creek as the south boundary of the tract conveyed. Plaintiffs derive their title

through that conveyance. In 1876 Hogue conveyed the remaining portion of his claim to the south of Hogue creek. Defendants derive their title through this latter conveyance. In the winter of 1874 the flow of the water in the Willamette river system near the Hogue Donation Land Claim changed markedly. The change is described as follows in the stipulation of facts agreed upon by the parties.

"In the winter of 1874 and 1875 there were high waters in the Willamette river system and when the high water went down and thereafter a substantial volume of the water that had previously gone down 'East River' went through 'Hogue Creek' and after that winter East River carried a substantially lower volume of water and the main volume of 'East River' went through 'Hogue Creek'.

"Because of the decreased flow of water in 'East River' that channel gradually filled and became partially dry land and partially a very slowly moving stream. Thereafter, 'Hogue Creek', which came to be referred to by many as the 'Willamette River' gradually moved back and forth through the Hogue D.L.C. #77."

■ Plaintiffs' position is that when the waters of the "East River" suddenly "broke through" Hogue creek the latter stream, having been obliterated and replaced by the Willamette river, could no longer be regarded as a moving boundary. Therefore, it is argued, as the Willamette river moved after the breakthrough the former thread of Hogue creek continued to mark the boundary between the plaintiffs' and defendants' land. In support of their position plaintiffs rely upon the principle of avulsion under which it is held that when a boundary stream suddenly changes its course the boundary is not marked by the new course of the

stream but remains as it existed prior to the sudden change.

We do not regard the principle of avulsion as applicable to the present case. Here there was no sudden change in the course of Hogue creek, the boundary stream; the stream merely increased in volume. With its increased volume Hogue creek flowed within new banks and in this sense the water flowed in a new course. But the principle of avulsion has not, as far as we have been able to ascertain, ever been applied when the sole change in the course of the stream involves simply an extension of its banks by the sudden influx of water.

The important consideration, however, is not whether the principle of avulsion has been applied to facts such as we have before us, but whether the underlying theory supporting that principle is applicable here. Neither the cases nor texts offer much enlightenment as to why the sudden shift of the course of a boundary stream does not result in a change of the boundary, whereas a gradual shift of the stream causes the boundary to move along with it. It has been suggested that "in fixing the boundary with reference to the water or some physical feature thereof, it may be presumed that the parties in interest had in mind the probability of its gradual change with the passage of years, but did not have in mind the possibility of a sudden and perceptible change."[1] We have no way of testing the validity of this assumption.

There are, however, considerations other than the intention of the parties which support the distinction in legal consequence between a sudden and gradual movement of a boundary stream. If the location of

---

[1] 4 Tiffany, Real Property § 1222, p. 623 (3d ed 1939).

the stream at the time of conveyance were regarded as the boundary in spite of the stream's imperceptible movement, as time passed the proof of the original location of the boundary line would, in most cases, be practically impossible. Such uncertainty in the identity of the original boundary line (ordinarily the unmarked thread of the stream) would be a fertile source of litigation.[2] It is better, therefore, that the boundary be regarded as moving with the gradual movement of the river.

The same considerations are not present when the boundary stream shifts suddenly and forms a new course. In such case the boundary formed by the original stream is identifiable by reference to the bed left dry as a consequence of the sudden shift in the stream.[3] Although this rule may work a hardship upon an upland owner by depriving him of access to the water, it seems preferable to a rule which would deprive the upland owner on the other shore of the stream of clearly identifiable land between the old river bed and the new course of the stream.

In the present case the sudden change in the character of Hogue creek by the influx of the waters from the Willamette river did not, as in the case of an avulsion, suddenly uncover an old boundary existing prior to the change. The boundary continued to be in the bed of the flooded stream. From the date of breakthrough in 1875 to the present time Hogue creek has shifted gradually and imperceptibly. Under either

---

[2] 4 Tiffany, Real Property § 1220, p. 620, 621 (3d ed 1939).

[3] The problem may be stated in terms of identifying the surface of the land itself. When soil is gradually and imperceptibly added to or eroded from the banks of the boundary stream it is usually impossible to identify the added or eroded area. Where, however, the stream makes a sudden shift identification of the land between the old river bed and the new course of the stream is generally possible.

plaintiffs' or defendants' theory of the case, immediately after the rise of the waters in Hogue creek the boundary would continue to be in the bed of the stream unfixed by any observable boundary monument. Treating the boundary as immutably fixed along the thread of Hogue creek prior to the sudden increase in its volume would in no way resolve uncertainties in the location of the boundary line as the stream changed its course in the future. If, however, the thread of Hogue creek continues to be recognized as the movable boundary, the respective interests of the owners on either side of the stream can be readily identified as the stream gradually changes its course. Thus the policy encouraging the establishment of readily ascertainable boundaries and discouraging boundary disputes and litigation is served.

In our view of the case it is immaterial whether the water flowing in the course of Hogue creek after the breakthrough in 1875 is denominated Hogue creek or the Willamette river. We are of the opinion that the increase in flow of water through the former course of Hogue creek does not make applicable the principle of avulsion for the reasons we have stated above. It is our conclusion, therefore, that the trial court properly held that after the breakthrough of the Willamette, Hogue creek continued to be a movable boundary, and that defendants have the title to the land in dispute.

Even if we were to accept plaintiffs' position that after the breakthrough of the Willamette river Hogue creek became a fixed boundary, the evidence is sufficient to establish defendants' title either under the theory of actual adverse possession of the entire area in dispute or possession under color of title.

The decree of the lower court is affirmed.