Argued and submitted September 15, affirmed June 6, reconsideration denied July 27, petition for review denied September 18, 1984 (297 Or 824)

WILT et al,
*Appellants,*

*v.*

ENDICOTT et al,
*Respondents.*

(34692; CA A25107)

684 P2d 595

Robert Mix, Corvallis, argued the cause and filed the briefs for appellants.

Edward V. O'Reilly, Eugene, argued the cause for respondents. With him on the brief were Roy E. Adkins and Adkins & Roberts, Eugene.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

Plaintiffs brought this action to quiet title and for an accounting for the value of river gravel and materials alleged to have been removed from their property by defendants. Defendants raised affirmative defenses by which they claimed ownership of the disputed property by accretion and adverse possession. After a trial without a jury, the court entered judgment for defendants, and plaintiffs appeal. We affirm.

The parties are owners of parcels of property separated by the Willamette River. In 1859, when Oregon became a state, the disputed property was dry land except for the non-navigable Hogue Creek, which traversed the property in a northwesterly direction connecting the main east and west channels of the Willamette River. The state, on admission to the Union, received fee title to the property, which it sold in 1872. In the winter of 1875, the east channel of the Willamette River broke through its bank upstream from the disputed property and flowed over the area previously occupied by Hogue Creek. Thereafter, Hogue Creek became the main channel of the Willamette River. Julia Cline acquired the property on both sides of that navigable river in 1892.

In 1897, Cline deeded to John Stahlbusch the portion of her property on the east side of the river as follows:

> "Beginning at the northeast corner of Lot 3 in Section 13, Township 12 South, Range 5 West, Will. Mer. and running from thence west 9.50 chains to the east bank of Hoag's *[sic]* Creek; thence in a southeasterly direction along the bank of said Hoag's *[sic]* Creek to the southeast corner of said Lot 3 in said Township and Range; thence north 20 chains to the place of beginning, containing 9.50 acres in Benton County, State of Oregon.

> "Also is hereby conveyed the gravel has now *[sic]* formed on the Easterly side of said above-described tract of land near the North West corner thereof and lying and being situated in Lots 2 and 3 of said sec. 13 T. 12 S.R. 5 W. and containing about 4 acres."

Title to that parcel has passed, by mesne conveyances using the identical description, to defendants.

In 1904, Cline conveyed her property on the west side of the river to the Wilt family, describing it as follows:

"Lot 1 of Section 14 and Lots 2 and 3 of Section 13 all in Township 12 South, Range 5 West of Willamette Meridian.

"Excepting therefrom 9 acres, more or less, heretofore deeded by said Julia Cline and husband to John Stahlbusch."

Plaintiffs derive their title through that conveyance.

The course of the Willamette River has made substantial movement through the years. The river migrated in a southwesterly direction between 1853 and 1913, reversed the migration to the northeast between 1913 and 1932, and then resumed its southwesterly movement until the time this complaint was filed in 1978. From 1853 to 1978, the river moved an average of 47 feet per year to the southwest. In 1943, it cut through a meander loop east and south of the disputed property. Because of the substantial erosion caused by the movement of the water, Stahlbusch, defendants' predecessor in interest, constructed a revetment on the east bank of the river in the early 1950s. About the same time, John Ash, to whom plaintiffs had deeded a portion of their property, constructed a revetment on the west bank as well. Ash had earlier removed gravel and materials from the west bank.

Between 1963 and 1967, the river migrated an average of 123 feet per year, broke through the Ash revetment and substantially eroded away the disputed property. The river eventually cut across the disputed property and around 1973 joined the old west Willamette River channel. The disputed property is now entirely on the east side of the river. Despite plaintiffs' protests, defendants have allowed various persons to remove materials from the disputed property since 1975.

The pivotal question is whether the trial court erred in holding that defendants' property rights extended to the thread of Hogue Creek, now the Willamette River.[1]

Plaintiffs first contend that the court improperly construed the words in defendants' deed "to the east bank of Hoag's *[sic]* Creek; thence along the bank" as conveying all of

---

[1] During his opening remarks to the trial court, defendants' counsel stated that defendants do not contend that their deed carried ownership beyond the bank of the river. Plaintiffs claim that this statement is a binding admission under ORS 9.330 that disposed of the necessity of construing the deed. Because this issue was not raised in the court below, plaintiffs are precluded from presenting it on appeal. *See, e.g., Ensley-Koebel v. Nat. Guar. Prop.*, 279 Or 391, 395-96, 568 P2d 655 (1977).

the grantor's property to the thread of the creek. In so interpreting the deed, the court relied on ORS 93.310(4)[2] and on *Belmont v. Umpqua Sand & Gravel,* 273 Or 581, 542 P2d 884 (1975), which held that, in a deed conveying upland bordering a non-navigable river, the phrase "to the south bank and then along said bank" is presumed to grant to the thread of the river.[3]

■      Plaintiffs argue that, because the river was navigable at the time of the conveyance in 1897, the rules of construction applicable to navigable rivers should be employed in interpreting the deed. Under the common law rule that vests title to the beds of navigable rivers in the state, when lands are described in a deed as bounded by a navigable river, the presumption is that the title extends only to the water's edge. *See Micelli v. Andrus,* 61 Or 78, 84-85, 120 P 737 (1912). Under that rule, the words "to the bank" have been construed as conveying only to the high water mark. *Richards v. Page Investment Co.,* 112 Or 507, 520, 228 P 937 (1924).

■      Because both parties agree that the state has no interest in the disputed property, other than a navigation servitude,[4] the trial court concluded that the rules of construction applicable to non-navigable rivers are more properly to be applied in interpreting the deed. It reasoned that the distinction between the rules developed because the government, either federal or state, owned the bed of navigable rivers to the

---

[2] ORS 93.310 provides, in part:

"The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful, and there are no other sufficient circumstances to determine it:

"* * * * *

"(4) When a road or stream of water not navigable is the boundary, the rights of the grantor to the middle of the road, or the thread of the stream, are included in the conveyance, except where the road or bed of the stream is held under another title."

[3] As an antecedent step in our analysis, we reject plaintiffs' contention that the deed was unambiguous and that the trial court erred in resorting to rules of construction in interpreting the deed.

[4] Hogue Creek was non-navigable until the breakthrough of the Willamette River in 1875. That the state acquired no interest in the disputed property would appear to be confirmed by *Purvine v. Hathaway,* 238 Or 60, 393 P2d 181 (1964), in which the court held that the 1875 breakthrough was not avulsive and that the thread of the river (Hogue Creek) remained the movable boundary between the properties on either bank.

high water mark. Given that predicate, navigability in this case made no difference, because neither government had title to the riverbed. We agree. The trial court's application of the rule in *Belmont* to the instant case is consistent with the presumption that grants by private persons are intended to convey all of the grantor's interest in the property unless there is an express reservation. It is also consistent with the public policy favoring riparian ownership. To apply the opposite rule in cases where the bed of the river is in private ownership might result in the creation of strips of land in separate ownerships with no water access. *McAdam v. Smith,* 221 Or 48, 54-57, 350 P2d 689 (1960). Moreover, as a practical matter, an intent that the soil in the river should not be owned by the person who owns the abutting upland is so improbable that it should not be presumed; it should be clearly expressed.[5]

It remains to be determined whether there was any evidence to rebut the presumption that, by the use of the words "to the bank" and "along the bank," the grantor intended to convey her interest to the thread of the stream. Plaintiffs rely on the fact that the grantor owned property on both sides of the river, but conveyed only her property on the east bank in 1897, as evidencing an intent to retain ownership in the river bed. Although the trial court recognized the right of a landowner to separate the upland from that below the high water mark, *Richards v. Page Investment Co., supra,* it surmised that the grantor probably never considered that the state did not own the riverbed. The court also found that, even if Cline had been aware of the extent of her ownership, there would have been no apparent benefit to her to limit the grant to the high water mark, because the potential for gravel in the riverbed would not have been of concern in 1897. Given that there is nothing more than speculation as to the grantor's intentions, the presumption has not been rebutted.

Plaintiffs next contend that, even if the court was correct in determining that the deed conveyed all property to the thread of the river, the court erred in finding that the

---

[5] *See* 12 Am Jur2d 566, *Boundaries* §24, where it is stated:

"The presumption is that no land is left without private ownership, and that the boundaries of the owners on opposite sides of the stream are in contact with each other, and the only place where they can touch without injustice to either owner is at the center of the stream."

movements of the river were gradual rather than avulsive, and in concluding that the thread of the river continues to be the boundary between the properties.

■    Because beds and shores of bodies of water are subject to movement, the general rule is that, when such changes are gradual, the boundary will follow the water rather than remain where it was on the ground at the time of the original conveyance. Thus, if the thread of a stream is the boundary between two parcels, the parcels will continue to be bounded by the actual middle of the stream "even though, as time goes by, that line moves in one direction or the other as the result of erosion on one side and the enlargement of the upland by accretion on the other." *Land Bd. v. Corvallis Sand & Gravel,* 283 Or 147, 161, 582 P2d 1352 (1978). The rationale for the rule is that a grantor, in fixing the boundary with reference to water, presumably had in mind the probability of gradual change. Moreover, if the location of the stream at the time of the conveyance were regarded as the boundary in spite of the stream's imperceptible movement, as time passed proof of the original boundary would, in most cases, be practically impossible. *Purvine v. Hathaway,* 238 Or 60, 63-64, 393 P2d 181 (1964).

■ ■    The same considerations are not present when the boundary suddenly and perceptibly shifts and forms a new course. When the movement is avulsive, the boundary formed by the original stream is identifiable by reference to the bed left dry as a consequence of the sudden shift in the stream, and no change of boundaries is worked thereby. *Purvine v. Hathaway, supra,* 238 Or at 64. The law presumes, however, that changes to riparian land occur "by accretion and not by sudden and violent force." *Gubser v. Town and Stoutenburg,* 202 Or 55, 73, 273 P2d 430 (1954).

Plaintiffs appear to contend that, because the breakthrough of the meander loop east and south of the disputed property around 1943 was an avulsive movement, all movements of the river were directly traceable to that avulsion and, therefore, that land boundaries did not change. Plaintiffs concede, however, that the issue is not the movement of the river during its history, but the movement during the period in which the river eroded away the disputed property. The evidence shows that from 1943 to 1963 there was practically

no movement of the river that affected the disputed property. The trial court thus properly focused its inquiry on the period from 1964 to 1970 as the time in which the major movement of the river through the disputed property occurred.

■ Plaintiffs advance a theory of "avulsive erosion," relying on the fact that from 1963 to 1972, the river moved a distance of 1,385 feet and substantially eroded away the disputed property. Testimony was presented that persons living near the disputed property could see great chunks of the left bank being broken off by the action of the river and could hear them "swishing" into the river as the bank was eaten away. Language in *State Land Board v. Sause et al,* 217 Or 52, 342 P2d 803 (1959), quoted with apparent approval from Black's Law Dictionary (4th ed 1951), would appear to support plaintiffs' theory:

> " "* * * In determining whether change in the course of the river *[sic]* is by "accretion" or "avulsion," the test is not whether witnesses might see from time to time that progress has been made, but whether witnesses could perceive change while it was going on. * * *' " 217 Or at 79.

In the same breath, however, the court cast the general rule as follows:

> "* * * [I]f the change be gradual, the boundary of the upland will follow the water; if it be sudden, the boundary remains as before." 217 Or at 80.

The question whether the movement was avulsive is, in every instance, one of fact.

■ The trial court found that the primary cause of the southwesterly movement of the river was the natural and gradual force of the cutting through of the meander loop to the south of the disputed property. Because both Ash and Stahlbusch had constructed revetments on each bank of the river, the erosion of the disputed property was attributable more to natural forces than to Stahlbusch's intervention. Several witnesses testified that the movement of the river should be characterized as natural and gradual, that there was accretion to the inside of the river opposite plaintiffs' property and erosion of plaintiffs' property. Other testimony showed that the Willamette River, from 1853 to the present, may be classified as a braided, multiple chain system characterized by a steep, shallow course with multiple channels among alluvial

islands. Such a system is relatively unstable, changes alignment rapidly, carries large quantities of sediment and is generally unpredictable. The trial court concluded that, although people were readily aware of the erosion, the river movement would have to be considered gradual and imperceptible.[6]

Although our review is *de novo,* we recognize that the trial judge, in cases such as this one, has the advantage of hearing witnesses explain their testimony by reference to the numerous exhibits and, therefore, has an edge over a reviewing court in the evaluation of the evidence. Further, there is no evidence here that the river suddenly changed course and cut through the disputed property. Rather, a change of course downstream from the disputed property in 1943 affected the erosion of the disputed property, which undisputably occurred rapidly some 20 years later. On these facts, we cannot say that the trial court erred in characterizing the movement of the river as non-avulsive and in quieting title in defendants.

Affirmed.

---

[6] In *Land Bd. v. Corvallis Sand & Gravel, supra,* 283 Or at 147, in refusing to find that the movement of the river was non-avulsive, the court distinguished cases cited by the state as involving "relatively *rapid erosion* of or accretion to the river bank along the established bed, not an actual change of course like that involved in this case. * * *" (Footnote omitted; emphasis supplied.) *See also Purvine v. Hathaway, supra,* 238 Or at 63, where the court found the principle of avulsion inapplicable when there was no sudden change in the course of the stream, but the stream increased substantially in volume.