## SALEM IMPROVEMENT CO. *v.* McCOURT.

DEED— ESTOPPEL— AFTER ACQUIRED TITLE.— The general doctrine that where parties have clearly manifested an intention to convey and receive, reciprocally, a certain estate, they are estopped from denying the operation of the deed according to such intent, and that an after acquired title cannot afterwards be set up by the grantee (*Taggart* v. *Risley*, 4 Or. 235, and *Wilson* v. *McEwan*, 7 Or. 87, cited and approved), cannot be invoked against the state in support of the unauthorized acts of its officers or agents, however long acquiesced in. Within the scope of this rule it is

held in this case that the act of a state officer in conveying land in Polk County when his authority was limited to Marion County is entirely void, and that the state is not estopped by his conduct.

APPEAL from Marion: GEO. H. BURNETT, Judge.

This is a suit to quiet title. The facts show that on September eighth, eighteen hundred and fifty-seven, in pursuance of an act of the legislative assembly of the Territory of Oregon, passed January twenty-sixth, eighteen hundred and fifty-six, the superintendent of common schools of Marion County, Oregon, sold as school land to one John A. Johns the south half of the southwest quarter of section twenty-eight in township seven south of range three west of the Willamette Meridian in said county, together with other real property, and on October twentieth, eighteen hundred and sixty, the full consideration therefor having been paid, executed and delivered a deed to him purporting to convey said land in pursuance of such sale. The west forty of said tract was made fractional by the main channel of the Willamette River, and that portion lying east of the river was surveyed and platted as lot six of said section, containing twenty-three and six hundredths acres. When the government survey was made, an island existed in said river, opposite said lot six, which was surveyed and platted as lot nine of section twenty-eight, containing seventeen and twenty hundredths acres and lot three of section twenty-nine, containing five and forty-two hundredths acres. The description of land contained in said deed embraced a part of said lot nine, triangular in form, its north and west lines extending about six and forty-three hundredths chains from the northwest corner of said west forty, which, together with the accretions thereto, forms the subject of this suit. Julia A. Johns, having acquired the interest of John A. Johns in said school lands, applied to the board of commissioners for

the sale of school and university lands for a confirmatory deed for the southeast quarter of the southwest quarter, and lot six of section twenty-eight, but made no application for any part of lot nine, and said board on February ninth, eighteen hundred and eighty, executed and delivered to her a deed to the property applied for. Said lot nine was selected by a duly authorized agent of the state in lieu of school lands lost to the state by sale or otherwise, and said selection was, on May twenty-seventh, eighteen hundred and ninety-one, duly approved by the secretary of the interior, subject to any valid interfering rights which might have existed at the date of the selection. The said board of commissioners for the sale of school and university lands, on June twenty-first, eighteen hundred and ninety-two, executed and delivered to Geo. D. Goodhue and others a deed purporting to convey said lot nine to them. The plaintiff has by mesne conveyances acquired their title thereto, while the defendants by mesne conveyances have acquired what title Julia A. Johns had to the triangular tract forming a part of said lot nine. When the deed to Johns was executed the main channel of the Willamette River lay between lot six and said island, the center of which formed the boundary line between the counties of Marion and Polk, but during a freshet in said river, the current changed its course and thereafter flowed west of said island, creating a new channel, and the old channel gradually filled up, so that a large part of the sand and gravel therein is now uncovered at low water. The defendants, at the commencement of this suit, claiming authority so to do under the Johns' deed and subsequent mesne conveyances through which they claim title, were digging and carrying away sand, loam, and gravel from the triangular tract embraced in said lot nine, and the accretions thereto, in the old channel. The plaintiff alleges ownership and possession of said lot nine and the

accretions thereto, and that the defendants claim to have
some adverse interest or estate in some part thereof, and
said allegations of ownership and possession having been
denied by the defendants, the case was referred to W. P.
Williams to take testimony, and upon the report thereof
by the referee, the court found for the defendants, and de-
creed that they were the owners in fee and entitled to the
possession of the lands in controversy, and awarded them
their costs and disbursements, from which decree the
plaintiff appeals.                                REVERSED.

*Messrs. Tilmon Ford,* and *S. T. Richardson,* for Appellant.

The points of contention between appellants and re-
spondents are as follows:   *First,* appellants claim title to
the land in controversy by virtue of the deed made by the
board of school land commissioners, set forth in this brief,
(see page 16,) while respondents claim they acquired prior
title to the land in controversy under and by virtue of the
school superintendent's deed, set forth in this brief, (see
pages 3, 4,) which appellants claim was void, and also that
the Territory of Oregon and the State of Oregon had no
interest or title in the land in controversy until May
twenty-seventh, eighteen hundred and ninety-one, and that
the school deed, if a superintendent's deed at all, would
not convey after acquired title; *second,* the respondents
contend that the school superintendent's deed would con-
vey to them after acquired title of the state in this land,
by estoppel, while the appellants contend that the state is
not estopped by this pretended school superintendent's
deed.

*School Superintendent's Deed.*—Appellants contend that
the deed through which respondents claim title (see page
3 of this brief) does not convey any title to the land in
controversy for the following reasons:  *First,* because the
land in controversy is not included in the school sections

sixteen or thirty-six, nor was the land owned by the state or territory in any capacity, but was land owned at the time the deed was made (October twentieth, eighteen hundred and sixty,) by the United States, and title did not pass to the State of Oregon until June eighteenth, eighteen hundred and ninety-one, at which time it was selected as lieu school land; *second,* there never was any grant to the Territory of Oregon of school lands, and the Territory of Oregon did not own any school lands. The grant of school lands in Oregon was made by the United States, in the act admitting the State of Oregon to the Union, (see Hill's Code, volume I, p. 123, § 4,) passed February fourteenth, eighteen hundred and fifty-nine, and the act of the Territory of Oregon authorizing the school superintendent to convey school lands was a nullity because the Territory of Oregon never at any time owned any school lands, nor did the United States ever grant any school land to the Territory of Oregon. The only grant of land the Territory of Oregon ever received was the grant of two townships of land for the establishment of a territorial university (see section 11, volume II, Hill's Code, p. 1797; also section 26, p. 1805,) and the "Oregon City claim" (section 12, volume II, Hill's Code, p. 1797); *third,* the act did not authorize the county school superintendent of Marion County to convey land situated in Polk County. The boundary line of Polk County was established in eighteen hundred and forty-five as the middle of the main channel of the Willamette River as it then ran: Hill's Code, edition of 1887, p. 1089, § 2277. (This section was amended by the legislature of eighteen hundred and ninety-one). The testimony shows conclusively that the main channel of the Willamette River was at that time running on the south and east side of this land, and that it was on the Polk County side of the main channel of the river when the act was passed defining the

26 OR.—13.

line, and though the river should change its bed afterwards it would not change the boundary line of the counties; *fourth*, The act of the Territory of Oregon authorizing the school superintendent to convey school lands was nullified by the constitution of Oregon, which was adopted after the passage of said act. The constitution provides that the governor, secretary of state, and state treasurer shall constitute the board for the sale of school and university lands, (see article VIII, section 5, Constitution of Oregon,) and this section means they are to have the exclusive sale of the school lands, and the supreme court of this state in construing this section of the constitution held in the case of *Fleischner* v. *Chadwick*, 5 Or. 152, that an act passed in eighteen hundred and sixty-eight, authorizing the county treasurer to handle school money was void, because it was taking it out of the power of the board.

*Estoppel.*—Respondents contend that the State of Oregon and appellants, its grantees, are estopped by this old school superintendent's deed to set up after-acquired title, and that the after-acquired title of the state, as soon as it vested in the state in June, eighteen hundred and ninety-one, passed to respondents by this deed. But this is not well taken for the following reasons: *First*, if they wished to avail themselves of an estoppel they should have plead it in this suit: *Rugh* v. *Ottenheimer*, 6 Or. 231; *Remillard* v. *Prescott*, 8 Or. 37. *Second*, this deed is the common form of quitclaim deed used in this state, and will not convey after-acquired title: *Shively* v. *Welch*, 2 Or. 288. And this rule is true in all the states except where there is a statute to the contrary, either in relation to a quitclaim or a bargain and sale deed, or any other deed that does not contain a warranty or covenant of title. Our Code goes farther and expressly provides that no covenant shall be implied: Section 3007, Hill's Code.

We quote from Rawle on Covenants, p. 390, *et seq.*   "But this doctrine which we have seen is unsupported by early authority, was soon after abandoned, and it was held, reversing the cases referred to, that where one conveyed land to which he had no title by deed of bargain and sale containing no covenants for title, nor any intimation that the grantee expected to become invested with an estate of a particular description, a subsequently acquired title would not inure to the benefit of the grantee, even as against the grantor and his heirs.  This decision has been almost constantly followed, and a large class of cases, both in New York and throughout the United States generally, have seemed to settle upon the conclusion that, as a general rule, in order that an after-acquired estate should pass by an estoppel, it is necessary that the deed should contain covenants for title of some sort or kind."   *Third,* our Code in relation to school land provides only the title then *in esse* shall pass ( see Deady's Code, 1845 to 1864, at top of page 886).   *Fourth,* the territorial act under which this deed was made did not authorize the school superintendent to make a deed with covenants of title, nor did it authorize him to make a deed to lands then not school lands; nor can any covenants of title be demanded of a ministerial vendor, crown, or commonwealth, nor can any covenants be implied from any words of grant or leasing: Rawle on Covenants of Title, pp. 51 and 52.   *Fifth,* unless the person executing a power for another is authorized by the power to make covenants of title, any covenants he makes will not bind his principal with relation to private persons, and will be void in excess of the power given: *Howe* v. *Harrington,* 18 N. J. Eq. 495; *Nixon* v. *Hyserot,* 5 Johns. 58; *Gibson* v. *Colt,* 7 Johns. 390; Martindale on Conveyancing, p. 199.

*Messrs. Bonham & Holmes,* for Respondents.

Opinion by MR. JUSTICE MOORE.

The plaintiff contends that the superintendent's deed conveyed *no title*, while the defendants contend that Johns, their grantor, having obtained a deed which purported to convey the fee simple title to the land in controversy, the state is estopped from claiming any after-acquired title, and that, plaintiff's grantors having obtained their deed from the state with notice of the prior recorded deed, the legal title inured to the defendants. Section 20 of the act of congress, approved August fourteenth, eighteen hundred and forty-eight (9 U. S. Stat. 323), reserved sections numbered sixteen and thirty-six in each township in the Territory of Oregon for the support of schools therein, and on July seventh, eighteen hundred and fifty-three, another act of congress was approved (10 U. S. Stat. 150), which authorized the legislative assembly of the territory to appoint the county commissioners of the several counties, or such other officer as it should direct, to select lands in lieu of sections sixteen and thirty-six when they had been taken under the donation law, or were otherwise disposed of. Whereupon the legislative assembly, in pursuance of this authority, passed an act, January thirty-first, eighteen hundred and fifty-five (Session Laws, 1855, p. 465), appointing the school superintendent of each county to select lands in his county in lieu of lands in sections sixteen and thirty-six lost to the territory by donation or otherwise, and on January twenty-sixth, eighteen hundred and fifty-six, passed another act (Session Laws, 1856, p. 69), which authorized the said superintendent to sell the school lands in their respective counties, for cash or upon time, and upon the payment of the purchase price to execute deeds thereto. Section 4 of the act of congress, approved February fourteenth, eighteen hundred and fifty-nine (11 U. S. Stat. 383), granted sections numbered

sixteen and thirty-six in every township to the State of
Oregon, and it was provided therein that where either of
said sections, or any part thereof, had been sold or other-
wise disposed of, other lands equivalent thereto should be
granted upon certain conditions therein named.   These
conditions were accepted by the legislative assembly of
the State of Oregon June third, eighteen hundred and fifty-
nine (Hill's Code, 125), and the state thereupon became
vested with the legal title to sections sixteen and thirty-
six, and such other land as had been selected by the school
superintendents in lieu thereof.   It will thus be seen that
the school superintendent of Marion County had authority,
under the acts of congress, and of the legislative assem-
bly of the Territory of Oregon, to select such lieu lands in
his county, but that at the time his deed was executed the
state had no title to any part of lot nine, which was situ-
ated in the county of Polk, and the question to be decided
is, would the title to the triangular tract on the island,
embraced in the superintendent's deed, inure to Johns
when the state acquired the legal title?

Section 6 of the act of January twenty-sixth, eighteen
hundred and fifty-six, authorized the school superintendent
to execute and deliver to the purchaser of school lands a
bond conditioned that he and his successor in office would
execute and deliver to such purchaser or his assigns a
proper deed in fee simple, upon the payment of the pur-
chase price and interest.   Section 5 of article VIII of the
state constitution created a board of commissioners for
the sale of school and university lands, consisting of the
governor, secretary of state, and state treasurer, and pro-
vided that its powers and duties should be such as might
be prescribed by law, but no statute authorizing said board
to make sale of school lands, or to execute deeds to pur-
chasers thereof was enacted by the legislative assembly
of the state until October twenty-second, eighteen hundred

and sixty-four: Deady's Code of Oregon, 1845 to 1864, p. 884. Section 7 of artitle XVIII of said constitution provided that all laws in force in the Territory of Oregon when the constitution took effect, and consistent therewith, should continue in force until altered or repealed. The state having acquired the legal title to sections sixteen and thirty-six, together with such other lands as had been properly selected in lieu thereof, the school superintendent of Marion County, on October twentieth, eighteen hundred and sixty, under the territorial act of January twenty-sixth, eighteen hundred and fifty-six, executed and delivered to Johns a deed, of which the following is a copy:

" Know all men by these presents, that whereas I, B. F. Bonham, superintendent of common schools in and for the county of Marion, and State of Oregon, in pursuance of an act passed by the legislative assembly of the Territory of Oregon on the twenty-sixth day of January, eighteen hundred and fifty-six, did, on the eighth day of September, eighteen hundred and fifty-seven, sell to John A. Johns three hundred and eighteen and sixty-four hundredths acres of the common school land of said Marion County for the sum of six hundred and thirty-seven dollars and twenty-four cents; and whereas the said John A. Johns has paid into the treasury of said Marion County the full purchase price of said land, wherefore I, the said B. F. Bonham, do by these presents bargain, sell, and convey unto said John A. Johns the following described tracts or parcels of school land as described on the plats of the United States, to wit: The south half of the southwest quarter of section twenty-eight in township seven north of range three west * * * containing three hundred and eighteen and sixty-four hundredths acres of land, more or less. To have and to hold the said premises, with all the appurtenances thereunto belonging, unto the said John A. Johns, his heirs and assigns, in fee simple forever.

"In witness whereof, I have hereunto set my hand and seal this twentieth day of October, eighteen hundred and sixty.

　　　[SEAL.]　　　　　　　　　　　　"B. F. BONHAM,

"Superintendent of common schools in and for the county of Marion, State of Oregon."

It will be seen from the foregoing that the superintendent had authority to sell the school lands of Marion County, Oregon, and to convey the same by a fee simple title, and the deed therefor is to all intents and purposes a patent of the State of Oregon: *Dolph* v. *Barney*, 5 Or. 191. At common law, when the mode of assurance was a feoffment, fine, or common recovery, an estate actually passed by operation of the doctrine of estoppel, which not only divested the party of what interest he then had in the land, but of every estate which he might thereafter, by any possibility, acquire, and this doctrine is now applied to modern covenants; but a grant or a release did not have this effect, and hence deeds of bargain and sale, lease and release, have no greater effect by way of estoppel than the common-law grant or release. "When, however," says Mr. Rawle, in his work on Covenants for Title, 388, "it has distinctly appeared in such conveyance, either by a recital, an admission, a covenant, or otherwise, that the parties actually intended to convey and receive, reciprocally, a certain estate, they have been held to be estopped from denying the operation of the deed according to this intent." In *Van Rensaelar* v. *Kearney*, 11 How. 325, it was held that if the grantor sets forth on the face of the instrument by way of recital or averment that he is seized or possessed of a particular estate in the premises, and which estate the deed purports to convey, the grantor and all persons in privity with him shall be estopped from ever afterward denying that he was so seized and possessed

at the time he made the conveyance.   In *Taggart* v. *Risley*, 4 Or. 235, the doctrine announced in the preceding case was quoted with approval, and it was there held that from the language employed in the deed it was evident the grantor intended to convey, and the grantee expected to become invested with, the land itself in fee simple, and that a covenant for quiet enjoyment estopped the grantor from setting up an after-acquired title.   The case of *Bailey* v. *McCoy*, 8 Or. 259, was an action to recover damages for an alleged breach of certain covenants in a deed which purported to convey only the right, title, and interest of the grantors in certain premises, with covenants of ownership, freedom from incumbrances, and general warranty. It was there held, affirming the doctrine of *Taggart* v. *Risley*, 4 Or. 235, that the action was maintainable.   In *Wilson* v. *McEwan*, 7 Or. 87, it was held that a power appointing an attorney to bargain and sell or dispose of in any manner he might see fit any lot as fully and effectually as the principal could do if personally present, authorized the attorney to execute a warranty deed upon a sale of said property, thus affirming the doctrine announced in *Taggart* v. *Risley*, 4 Or. 235, also held that the grantees of the principal were estopped from setting up any after-acquired title.

   In the case at bar, the superintendent, in pursuance of the statute then in force, executed and delivered a deed to defendant's grantor which, upon its face, purported to convey an estate in fee simple forever, and expresses a manifest intention to deal with the land itself and not with a mere interest therein, which deed having been accepted by the grantee, it must be presumed the parties actually intended to convey and receive reciprocally the estate therein specified, and it only remains to be seen whether the state is estopped from denying the operation of the deed according to this intent.   While there is a conflict of

authority upon this question in cases where the officers have acted within the scope of their powers, the courts have uniformly held that the doctrine of estoppel cannot be invoked against the estate in support of the unauthorized acts of its officers and agents, however long acquiesced in: *Attorney-General* v. *Marr*, 55 Mich. 445; *Pulaski County* v. *State*, 42 Ark. 118; *Day Company* v. *State*, 68 Tex. 526. In *State ex rel. Lott* v. *Brewer*, 64 Ala. 287, it was held that all who deal with the officers or agents of the government must inquire at their peril into the extent of their power, and that the act of no agent, public or private, not within the scope of the agency, can bind the principal by way of estoppel, no matter how much reliance may have been placed upon it. "A state," says Mr. Throop, in his work on Public Officers, § 551, "is never estopped on the ground that its agent is acting under an apparant authority which is not real." Assuming that the term, "in fee simple forever," as used in the superintendent's deed, was sufficient to convey an after-acquired estate, it could only apply to state lands in Marion County. The superintendent had no authority to sell or convey the school lands situated in the county of Polk, and the attempt on his part to do so was unauthorized. And as the state is only estopped by the acts of its agents and officers when done within the scope of their authority, the doctrine of estoppel cannot be invoked in the case at bar.

The plaintiff, in substance, alleged that accretions having been gradually formed on the east side of said lot nine had caused said river to recede till the old channel has become filled with sand, gravel, and loam, and the river now flows on the west side of said lot, and that the east boundary thereof has, in consequence of such accretions, been extended to the center of the old river bed, which was described by course and distance. This allegation

26 OR.— 14.

was stricken out by the court, and, as the plaintiff contends, erroneously. We think the allegation was material and presented an issue as to the boundary between the estates of the parties hereto. The court must take judicial knowledge that the Willamette River, as it flowed between lots six and nine, was a public navigable stream (*Shaw* v. *Oswego Iron Company*, 10 Or. 371), and hence the title to the bed thereof was in the state: Gould on Waters, § 158. If by any sudden change in the course of the river, the old bed became filled with sand, gravel, and loam, the state was was not thereby divested of its legal title, and neither plaintiff nor defendant could claim any interest therein, except as to such parts as had been added to their respective estates by imperceptible accretions, and the line where such accretions met would become the boundary of their estates: *Buse* v. *Russell*, 86 Mo. 209. This was an issue tendered by the plaintiff, which it was entitled to have tried, if contested, and the motion to strike the said allegation from the complaint must be overruled. Ejectment is the proper remedy for settling questions of disputed boundaries, but equity having obtained jurisdiction for the purpose of quieting the title to the disputed tract will retain it for the purpose of ascertaining the extent of the accretions thereto when controverted by others. The decree appealed from will therefor be reversed, and a decree entered here for plaintiff that it is the owner in fee of said lot nine, together with the accretions, if any, and quieting its title thereto, and that the cause be remanded to the court below to determine the question of boundary, if the allegation so erroneously stricken out shall be controverted.

REVERSED.