Reargued December 5, 1977, opinion remanded with directions August 1,
petition for rehearing denied September 6, 1978

STATE ex rel STATE LAND BOARD,
*Appellant—Cross-Respondent,*

*v.*

CORVALLIS SAND AND GRAVEL COMPANY,
*Respondent—Cross-Appellant.*

(No. SC 1940)

582 P2d 1352

[ 147 ]

Michael D. Reynolds, Assistant Attorney General, Salem, reargued the cause for appellant—cross-respondent. With him on the briefs were James A.

Redden, Attorney General, W. Michael Gillette, Solicitor General, and Peter S. Herman, Senior Counsel, Salem.

Robert Mix, Corvallis, reargued the cause and filed briefs for respondent—cross-appellant.

Robert E. Stacey, Jr., Portland, filed an amicus curiae brief for 1,000 Friends of Oregon.

Before Denecke, Chief Justice, and Holman, Howell, Bryson, Lent and Linde, Justices.

HOWELL, J.

## HOWELL, J.

This action of ejectment is before us on remand from the United States Supreme Court. The issues involve the title to the bed of certain navigable portions of the Willamette River. Prior opinions of this and other courts contain the lengthy history of this litigation.[1] By now many issues previously raised have been either finally determined or abandoned. We may, therefore, now disregard many of the factual details which were significant at earlier stages of these proceedings, and treat the questions of title with which we are presently concerned under two general headings: (1) title to those disputed portions of the bed which have been (or may be treated as though they have been) the bed of the main channel of the Willamette River since statehood; and (2) title to the bed of what has been referred to as "Fischer Cut"—an area which has been part of the main channel of the river since 1909 but which, prior to that time, had been an overflow channel, submerged only at the intermediate and higher stages of the river.

The United States Supreme Court in this case overruled *Bonelli Cattle Co. v. Arizona,* 414 US 313, 94 S Ct 517, 38 L Ed2d 526 (1973), which had held that in a dispute between a state and a riparian owner who claimed under a federal patent, federal common law determined the effect on title of the withdrawal of a

[1] *Corvallis Sand & Gravel v. Land Board,* 250 Or 319, 439 P2d 575 (1968); *Land Bd. v. Corvallis Sand & Gravel,* 18 Or App 524, 526 P2d 469 (1974); *aff'd as modified* 272 Or 545, 536 P2d 517, 538 P2d 70 (1975); *vacated and remanded* 429 US 363, 97 S Ct 582, 50 L Ed 2d 550 (1977).

The trial court, applying state law, gave judgment for the state as to several of the parcels in dispute and awarded damages for the defendant's use of some of those parcels. The trial court also held that defendant was the owner of the area called Fischer Cut. The Court of Appeals, applying federal law to questions of title, affirmed, with some modifications as to damages. 18 Or App 524. On review, we directed further modifications as to the length of Fischer Cut, and ordered further proceedings in the trial court to locate the additional portions of Fischer Cut and to adjust the damages if our modification made that appropriate. 272 Or 545. The United States Supreme Court held that questions of title should be determined under state rather than federal law and remanded the case to us for further consideration. 429 US 363.

navigable river from a portion of its bed. In overruling *Bonelli,* the Supreme Court said:

> "Bonelli's thesis that the equal-footing doctrine would require the effect of a movement of the river upon title to the riverbed to be resolved under federal common law was in error. Once the equal-footing doctrine had vested title to the riverbed in Arizona as of the time of its admission to the Union, the force of that doctrine was spent; it did not operate after that date to determine what effect on titles the movement of the river might have * * *.

> "* * * Since the application of federal common law is required neither by the equal-footing doctrine nor by any other claim of federal right, we now believe that title to the Bonelli land should have been governed by Arizona law, and that the disputed ownership of the lands in the bed of the Willamette River in this case should be decided solely as a matter of Oregon law." 429 US at 371-72, 50 L Ed2d at 558-59.

In spite of this language in the Supreme Court's opinion, defendant Corvallis Sand and Gravel now argues that title to the portions of the riverbed, other than Fischer Cut, which are involved in this case did not pass to Oregon upon its admission to the Union under the equal-footing doctrine, but were thereafter conveyed to defendant's predecessors in title by United States patents conveying the adjoining upland. Although we doubt that the issue is properly before us,[2]

---

[2] Insofar as defendant's argument is based on the proper application of the federal equal-footing doctrine, it was probably foreclosed by implication by the decision of the United States Supreme Court in this case. However, defendant points to certain language in that opinion in support of its argument. *See n. 9, infra,* and accompanying text. Insofar as the argument is based on principles of state property law, it could have been raised at trial but was not. *See n. 16, infra.*

We have not considered defendant's additional arguments that even if the state has title to the bed, nevertheless defendant, by virtue of its status as a riparian owner, or alternatively, as a member of the public, has a right to remove sand and gravel without accounting to the state. Those arguments could have been, but were not, raised at earlier stages of these proceedings. Unlike other arguments which are made here for the first time, and which we have considered, these contentions have no arguable basis in the United States Supreme Court's decision, which was concerned only with questions of title.

we have considered this argument and determined that it is not well taken.

■■ The original states, by virtue of their sovereignty, succeeded to title held by the English crown to the beds of the navigable waters within their boundaries.[3] When additional states were admitted to the union, they were admitted on an equal footing with the original states and, therefore, they also acquired title to the beds of their navigable waters except any portions which had passed into private ownership prior to statehood.[4] While the land out of which the new states were formed was held by the federal government, that government had the power to alienate the title to the beds of navigable waters, but it was never the general policy of the federal government to do so as part of its disposition of the public lands. Therefore, a pre-statehood federal patent which describes the land conveyed as running to or bounded by a navigable body of water will be construed as conveying title only as far as the high water mark. The land below high water mark, except such portions as may have been conveyed by a properly authorized grant clearly expressing that intention, was retained by the federal government in trust for the future states and passed to them upon admission to statehood. The federal government, therefore, had no power to convey it by a post-statehood patent.[5]

---

[3] *Martin v. Waddell,* 41 US (16 *Peters*) 367, 10 L Ed 997 (1842).

[4] *Pollard's Lessee v. Hagan,* 44 US (3 *How*) 212, 11 L Ed 565 (1845); *Shively v. Bowlby,* 152 US 1, 47-48, 14 S Ct 548, 38 L Ed 331, 348-49 (1899).

[5] *Shively v. Bowlby, supra note 2,* 152 US at 47-48, 38 L Ed at 348-49. Both of the riparian patents under which defendant claims were issued after Oregon's admission to statehood. Defendant contends that the Avery patent, dated October 19, 1859, was based on pre-statehood homestead entry in 1846, and that Avery's title related back to that date. We may assume, for purposes of this case, that that is so. The Avery land is described in the patent in part as:

"* * * thence East sixteen chains and twenty three links *to the Bank of the Willamette River* & thence South twenty four degrees West twenty nine chains and Thirty links *along the Bank of said river;* * * *." (emphasis added).

The waters to which these general rules apply are those which, at the time of admission to statehood, were navigable in fact according to the federal test of navigability.[6] For some time it was assumed by many American courts that navigability for title purposes was to be tested according to the rule which was thought to apply in England: that navigable waters were limited to those in which the tide ebbed and flowed.[7] However, the United States Supreme Court held in *Barney v. Keokuk,* 94 US (4 Otto) 324, 24 L Ed 224 (1877), that the states' title included the beds of all waters which, upon admission to the union, were actually navigable, whether or not they were affected by the tide. Subsequent decisions of the Supreme Court have treated *Barney* as a correct and authoritative statement of the rule.[8]

■ Under that rule, Oregon, when it was admitted to the Union in 1859, acquired title to the bed of the navigable portions of the Willamette River. Thus, the

---

[6] *Barney v. Keokuk,* 94 US (4 Otto) 324, 24 L Ed 224 (1877); *Utah v. United States,* 403 US 9, 91 S Ct 1775, 29 L Ed 2d 279 (1971).

[7] In this country, the development of the law governing title to submerged lands has been profoundly influenced by the assumptions that the title to the beds of navigable waters in England was in the crown, and that navigable waters in that country consisted only of waters affected by the tide. It is quite likely that the courts have been mistaken in both of these assumptions. *See* MacGrady, *The Navigability Concept in the Civil and Common Law: Historical Development, Current Importance, and Some Doctrines That Don't Hold Water,* 3 Fla St U L Rev 511, 547-587 (1975). The author of that article concludes that the crown's title to the beds of navigable rivers was not a rule of law but was, at most, a rebuttable presumption which rested on dubious authority. He also concludes that the common law rule limiting admiralty jurisdiction to tidal waters had nothing to do with questions of navigability of the waters or title to the underlying soil.

However mistaken the courts of this country have been in their assumptions about the relevant common law rules, those assumptions have become an integral part of the development of our law. No purpose would be served by a complete re-examination here.

[8] *See, e.g., State Land Bd. v. Corvallis Sand & Gravel Co.,* note 1 supra; *Scott v. Lattig,* 227 US 229, 242-43, 33 S Ct 242, 57 L Ed 490 (1913); *McGilvra v. Ross,* 215 US 70, 30 S Ct 27, 54 L Ed 95 (1909); *Shively v. Bowlby,* note 4 supra.

holding in *Barney* would appear to dispose of this case except for the question of title to Fischer Cut.

Defendant contends, however, that the holding of that case cannot be applied here. It argues that *Barney v. Keokuk* was a change in the law,[9] and that its holding cannot be applied in such a way as to affect previously vested rights. Defendant traces its title to federal conveyances prior to 1877, when that case was decided, and argues that those conveyances, under the rule prevailing at the time, conveyed title to the riverbed as well as to the adjoining upland.[10]

In support of its argument that when its predecessors acquired title, the prevailing law was that title to nontidal riverbeds passed into private ownership along with the adjoining upland, defendant cites *Jones v. Soulard,* 65 US (24 How) 41, 65, 16 L Ed 604 (1860), in which the Court said:

> "Many authorities resting on adjudged cases have been adduced to us in the printed argument presented by the counsel of the defendant in error, to show that from the days of Sir Matthew Hale to the present time all grants of land bounded by fresh water rivers, where the expressions designating the water line are general, confer the proprietorship on the grantee to the middle thread of the stream, and entitle him to the accretions.

> "We think this, as a general rule, too well settled, as part of the American and English law of real property, to be open to discussion; and the inquiry here is, whether the rule applies to so great and public a water-course as the Mississippi is, at the City of St. Louis?"

---

[9] Defendant contends that the United States Supreme Court has so characterized that decision, relying on the following language:

"'* * * In *Barney v. Keokuk,* 94 US 324, 338, 24 L Ed 224 (1877), the Court *extended the doctrine* to waters which were nontidal but nonetheless navigable * * *.' *State Land Bd. v. Corvallis Sand & Gravel Co., note 1 supra,* 429 US at 374, 50 L Ed2d at 561. (Emphasis added.)

[10] Defendant claims under two federal patents to riparian land, dated 1859 and 1882. The 1882 patent was based on a homestead entry in 1875, prior to the decision in *Barney v. Keokuk.* Defendant contends that the title conveyed by the 1882 patent would relate back to the date of entry, 1875. For purposes of this case we assume, without deciding, that that position is correct.

The court held that the "well-settled" rule did apply to that river. It is difficult to ascertain, however, just what rule the court held applicable. The land in dispute in that case was not the riverbed itself, but land which had, after the state entered the union, formed by accretion and eventually connected the shore with a pre-existing gravel bar.

The "rule" stated in the above quotation is really two rules. The first is that a grant of riparian land bounded by a fresh-water river will be construed as extending to the middle of the stream. The second is that a riparian owner is entitled to accretions which become a part of, and enlarge, his land. The well-recognized right to accretions is a riparian right which is not dependent upon ownership of the adjacent bed.[11]

It is possible that the second rule alone was enough to dispose of the case; the statement of facts does not disclose whether the accreted land in dispute attached itself originally to the shore, or whether it constituted an enlargement of the sand bar (which was part of the bed of the river) or both. The opinion of the court appears to rely both upon the riparian right to accretions and on the riparian owner's title to the bed itself.

In *Barney v. Keokuk, supra,* in which the court held that the states, upon admission to the Union, had acquired title to the beds of all navigable waters within their boundaries, the opinion notes that the states had been free to decide for themselves whether to retain or dispose of that title. "If they [the states] choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections." 94 US at 338. It appeared to the court that Iowa, the state in which that case arose, had not chosen to do so but had adopted the rule that riparian proprietorship along the Mississippi River was bounded by the high water mark and that the state owned the bed of the river below

---

[11]4 Tiffany, Real Property § 1219 (3d ed 1975).

that line. In that opinion the court did not attempt to canvass its earlier cases, saying only:

"* * * The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the States in which the lands were situated." *Id.*

Some years later, however, in *Shively v. Bowlby,* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1893), the Supreme Court undertook an exhaustive review of the law governing titles to lands under navigable waters. In that opinion the court reaffirmed the holding of *Barney v. Keokuk,* and said:

"The decisions of this court, referred to at the bar, regarding the shores of waters where the ebb and flow of the tide from the sea is not felt, but which are really navigable, should be considered with reference to the facts upon which they were made, and keeping in mind the local laws of the different States, as well as the provisions of the acts of Congress relating to such waters." 152 US at 31, 38 L Ed at 343.

The decision in *Jones v. Soulard* was explained as governed by the rule, recognized in Missouri where the case arose, that accretion belongs to the owner of the riparian land to which it attaches, a rule which is "independent of the law governing the title in the soil covered by water." 38 L Ed at 344. The only question in that case, the court said, "was of the title, not in the bed or shore of the river, but only in accretions which had become part of the fast land." Id.[12]

---

[12]The discussion of the *Jones* case in *Shively* does not explain why the court in *Jones* found it necessary to determine that the pre-statehood charter of the City of St. Louis, the source of the prevailing party's title, extended to the center of the river. It is clear, however, that in *Shively* the court viewed the *Jones* case as governed not by federal law but by the local law of Missouri.

In *Joy v. St. Louis,* 201 US 332, 26 S Ct 478, 50 L Ed 776 (1906) the court held that the question of whether a riparian owner who claimed under a federal patent was entitled to accretions was not a federal question, and the court was without jurisdiction in the case; *but see, Hughes v. Washington,* 389 US 290, 88 S Ct 438, 19 L Ed 2d 530 (1967). *Jones v. Soulard,* however, appears to be a diversity case, so the fact that the court determined the merits does not assist in determining whether the decision is based on federal or state law, or both.

■ The parties have not cited, and we have not found, any early United States Supreme Court cases in which the holding is inconsistent with the rule announced in *Barney v. Keokuk.* We conclude that that decision did not constitute a change in the rules of property law, and that earlier federal patentees whose grants were bounded by the water had not acquired a vested right to the navigable riverbeds adjoining their upland property. Were it otherwise, the results in such cases as *Barney v. Keokuk* itself and *Packer v. Bird,* 137 US 661, 11 S Ct 210, 34 L Ed 819 (1891),[13] would have been improper.

Defendant also contends that even if its predecessors did not acquire vested rights in the riverbed under federal law as embodied in *Jones v. Soulard,* nevertheless the state of Oregon, by its adoption of the common law, exercised its prerogative to surrender its title to the owners of riparian land adjacent to nontidal rivers. Article XVIII, § 7 of the Oregon Constitution provides:

> "All laws in force in the Territory of Oregon when this Constitution takes effect, and consistent therewith, shall continue in force until altered, or repealed."

This court has recognized that this provision of the constitution continued in force the substantive principles of the common law which were adopted by the provisional government and sanctioned by the federal act establishing the territorial government. *See, e.g., United States F. & G. Co. v. Bramwell,* 108 Or 261, 264-65, 217 P 332 (1923); *Peery v. Fletcher,* 93 Or 43, 52, 182 P 143 (1919). This recognition does not, however, establish that any given common law rule was ever in force in this state:

> "The common law, as it existed in England at the time of the settlement of the American colonies, has never been in force in all of its provisions in any colony or state of the United States. It has been adopted so far only as its general principles were suited to the habits

---

[13] *Packer v. Bird* holds that the question whether title to the bed of a navigable non-tidal river was held by a riparian claimant tracing title to an 1857 federal patent was governed by state, not federal, law.

and conditions of the colonies, and in harmony with the genius, spirit and objects of American institutions. Different geographical conditions may justify modifications, and whether common-law rules will be followed strictly in the United States will, necessarily, where no vested rights are actually concerned, depend upon the extent to which they are reasonable and in consonance with public policy and sentiment. What may be the common law in one state is not necessarily so considered in another." *Peery v. Fletcher, supra,* 93 Or at 52-53.

The mere adoption of the English common law, in general terms, does not of itself compel the conclusion that this state adopted upon statehood the supposed English rule that the sovereign owns only the beds of tidal waters, while in non-tidal navigable rivers the title to the bed is in the riparian owners. There are significant geographical differences between this state and England which make it reasonable, as an original proposition, to question whether that rule was suitable to our conditions.

A state which has, in its constitution or by statute, adopted the common law in general terms is not precluded by the federal constitution from asserting state ownership of the beds of non-tidal, as well as tidal, navigable waters. *Wear v. Kansas,* 245 US 154, 38 S Ct 55, 62 L Ed 214 (1917). It was open to this state to determine, when the question arose, whether it would assert its title to the beds of all navigable rivers or whether, by recognition and adoption of the English rule, it would resign its title above the reach of the tide to the riparian owners.

No early legislation either asserted or relinquished the state's title. The question did not come squarely before this court until the decision in *Hume v. Rogue River Packing,* 51 Or 237, 83 P 391, 92 P 1065, 96 P 865 (1908). That case held that the state had title to the beds of navigable freshwater rivers:

"By the law of this state, as declared and established by this court, the owner of upland bordering on [non-tidal] navigable water has no title in the adjoining lands

[ 157 ]

below high-water mark, nor any rights in or over the adjoining waters as appurtenant thereto: * * *." 51 Or at 246.

Although that was the first such holding in this state, it was not, as defendant contends, a change in the law. Prior cases concerning title to submerged lands had involved only the beds of tidal waters,[14] and the law applicable to non-tidal navigable rivers had never been declared. It had, however, been foreshadowed in earlier cases. See, for example, *Weise v. Smith,* 3 Or 445 (1869). That case did not involve the title to a riverbed, but considered the navigability of the Tualatin River in another context. Nevertheless, the opinion is suggestive of this court's early view of the supposed English rules regarding navigability:

"It may be considered the settled law of the United States, that so much of the doctrine of the common law of England, as made the ebb and flow of the tide a test of navigability, is not now applicable in the United States * * *.

"It is held more rational to determine the question of navigability or unnavigability of a stream, from the fact of navigation or otherwise, than from a circumstance which may or may not be conclusive evidence of its navigability." 3 Or at 448-49.

In *Shaw v. Oswego Iron Co.,* 10 Or 371 (1882), the question of title to navigable riverbeds was argued but did not have to be decided. The opinion discussed the question at some length, collecting the authorities, and treated the question as an open one in this state.

The issue in *Lewis v. City of Portland,* 25 Or 133, 35 P 256 (1893), was not title to the bed but the right of the riparian owner to wharf out into the Willamette River. As part of its consideration of that question the

---

[14] *See, e.g., Hinman v. Warren,* 6 Or 408 (1877); *Parker v. Taylor,* 7 Or 435 (1879); *DeForce v. Welch,* 10 Or 507 (1883); *Wilson v. Shiveley,* 11 Or 215, 4 P 324 (1884); *Wilson v. Welch,* 12 Or 353, 7 P 341 (1885); *Bowlby v. Shively,* 22 Or 411, 30 P 154 (1892); *Lewis v. City of Portland,* 25 Or 133, 35 P 256, 22 LRA 736, 42 ASR 772 (1893).

opinion discusses the state's ownership of lands under tide waters, and continues:

> "* * * The same rule has been extended to our great fresh-water lakes, which, owing to the extended commerce conducted upon them, are treated as inland seas; and also, in some of the states, to the great fresh-water rivers which are navigable in fact, as the Mississippi, the Missouri, the Ohio, and, in the state of Pennsylvania to all its permanent rivers; such rule depending on the law of each state as to what waters, and to what extent, the prerogative of the state over the lands under water shall be exercised. The question, as Mr. Justice Bradley said, is one for the several states themselves to determine. 'If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections.' *Barney v. Keokuk,* 94 U.S. 324. *So it appears that the same rule as to the ownership of and the sovereignty over lands under the navigable waters of the great lakes and fresh-water rivers applies which obtains at common law as to the ownership of and sovereignty over lands under tide waters, and that such lands are held by the same right in the one case as the other, and subject to the same trusts and limitations * * *."* 25 Or at 160. (Emphasis added).

■ In light of these early cases, it is clear that the question of title to the beds of navigable rivers was never treated as settled in favor of the riparian proprietor, and the defendant's predecessors in title did not, by force of state law, acquire title to the adjacent riverbed. We hold, therefore, that the Court of Appeals correctly determined that the state is entitled to possession of the disputed portions of the riverbed other than Fischer Cut.

The remaining issues have to do with title to the bed of Fischer Cut. Concerning that part of the present bed of the river, the trial court made the following findings of fact:

> 1. Fischer Island from 1853 to 1909 was a peninsula-like formation around which the Willamette River coursed.

2. By 1890 a clearly discernible overflow channel over the neck of the peninsula had developed known as Fischer Cut.

3. In 1890 Fischer Cut would have had to be cleared of driftwood and willow growth before it could possibly accommodate the flow of the river. The Fischer Cut Channel was dry at low water, or below the five-foot stage, and carried water only at intermediate or high stages of the river.

4. In January of 1906 the Fischer Cut Channel was in practically the same location as it was in 1890. It was estimated then that roughly one-quarter of the flow of the river was carried through Fischer Cut.

5. Between 1890 and 1909 the high water overflow through Fischer Cut did not sufficiently clear Fischer Cut to allow for the full flow of the river and the river continued to flow around Fischer's Island during that period.

6. As the result of a flood of November 25, 1909, the river suddenly and with great force and violence converted Fischer Cut into the main channel of the river.

7. The change was not gradual and imperceptible but was a rapid and violent change of course.

There was, it has already been held, sufficient evidence in the record to support these findings.[15] When the case was first before the Court of Appeals and this court, it appeared that under the rule of the *Bonelli* case the legal consequences of these facts, as they affected title to the bed of Fischer Cut, were governed by federal common law. In its decision in this case the United States Supreme Court overruled *Bonelli* on that point and held that state law governs. The parties have, therefore, briefed and argued before us the question of what the applicable state law is or should be.

Defendant contends that the change in the main channel resulting from the flood of November 25, 1909, constituted an avulsion, and that under accepted principles of law an avulsive change in the course of a

---

[15] *See* 272 Or at 546; 18 Or App at 539.

river does not affect the title to the land constituting either the old or the new bed. As a consequence, defendant argues, it owns the bed of the river through Fischer Cut because it owns the land through which that channel was created in 1909.

The state makes several arguments in support of its claim of title to the bed of the river at Fischer Cut. Those arguments may be grouped under two headings: (1) the state owns the beds of all navigable rivers within its boundaries, regardless of how or when a particular portion of the bed was formed;[16] (2) in any event, what happened in November of 1909 was not an avulsion if that term is properly defined for title purposes.

■ Our consideration of these arguments will be clearer if we begin by stating the general principles involved. Although real property boundaries are generally fixed in the location established by the instrument of conveyance, there is a recognized exception for boundaries located on or in bodies of water. The beds and shores of bodies of water tend to change location; this tendency has resulted in a general rule that, where such changes are gradual, the boundary will follow the water rather than remain where it was on the ground at the time of the original conveyance. That is, if the middle of a stream is the boundary between two parcels of land, the two parcels will continue to be bounded by the actual middle of the stream even though, as time goes by, that line moves in one direction or the other as the result of erosion on one side and the enlargement of the upland by accretion on the other. Similarly, if the line of ordinary high water is the boundary between the bed of a navigable river, owned by the state, and the privately-owned riparian upland, that boundary will remain at the line

_____

[16]Like some of defendant's arguments, this contention appears here for the first time even though it could have been made in the trial court. Because of the public importance of the questions involved in this case, and because the parties have briefed and argued the matter, we have considered it as though it had been timely argued.

of ordinary high water, although gradual changes in the course of the river or the contour of the banks may alter the actual location of the high-water line.[17]

A number of reasons have been given in support of this general rule. Six different rationales are identified and discussed in Beck, *The Wandering Missouri River: A Study in Accretion Law,* 43 N Dakota L Rev 429, 432-439 (1967). The author there concludes that although the courts may not always say so, they appear most often to base their application of this rule on the desirability of preserving the adjacent landowner's access to the water. When considering the application of this rule in boundary disputes between private parties, this court has on occasion stressed the importance of access to the water.[18] However, as Justice O'Connell pointed out in *Purvine v. Hathaway,* 238 Or 60, 63-64, 393 P2d 181 (1964), the influence of that concern has its limits. In that case we placed particular stress on the reliable ascertainment of boundaries:

"* * * If the location of the stream at the time of conveyance were regarded as the boundary in spite of the stream's imperceptible movement, as time passed the proof of the original location of the boundary line would, in most cases, be practically impossible. Such uncertainty in the identity of the original boundary line (ordinarily the unmarked thread of the stream) would be a fertile source of litigation. It is better, therefore, that the boundary be regarded as moving with the gradual movement of the river.

"The same considerations are not present when the boundary stream shifts suddenly and forms a new course. In such case the boundary formed by the original stream is identifiable by reference to the bed left dry as a consequence of the sudden shift in the stream. Although this rule may work a hardship upon an upland owner by depriving him of access to the water, it seems preferable

---

[17] *See generally,* 4 Tiffany, *supra* n. 11, § 1220; 3 American Law of Property § 15.27 (1952).

[18] *See, e.g., Hanson v. Thornton,* 91 Or 585, 591, 179 P 494 (1919); *Gillihan v. Cieloha,* 74 Or 462, 467, 145 P 1061 (1914).

to a rule which would deprive the upland owner on the other shore of the stream of clearly identifiable land between the old river bed and the new course of the stream." (Footnotes omitted).

The state does not deny that these are legitimate considerations, or that the doctrine of avulsion as an exception to the general rule was properly described in *Purvine.* It argues, however, that the rationale of that doctrine is limited to the question of determining the boundary between two parcels of riparian property, and that the rule itself ought to be similarly limited. In fact, the state contends, the concern expressed in *Purvine* to avoid the need for litigation to determine boundaries actually supports its position. That argument has considerable force. Certainly a rule that the state owns the beds of all navigable rivers, regardless of the time and nature of any changes in those beds, would be easier of application than the rule for which defendant contends: that any portion of the bed of a navigable river which was formed, after statehood, by an avulsive change remains in private ownership.

The rule suggested by the state appears to be in force in Louisiana and Texas where the principles governing title to land are derived from the civil law.[19] We have found no indication that its application has presented any serious problems in those states. However, simplicity and workability of the rule do not, alone, justify its adoption. We may not adopt a rule, however desirable in other respects, which would take away private property and give it to the state. Unless we can determine, as we did in an earlier portion of this opinion, that a rule of property placing title in the public has been the law since statehood (or at least since defendant's predecessors acquired title from the federal government), we cannot adopt and apply it here.

[19] *Dickson v. Sandefur,* 259 La 473, 250 So 2d 708 (1971); *Maufrais v. State,* 142 Tex 559, 180 SW2d 144 (1944); *Manry v. Robison,* 122 Tex 213, 56 SW2d 438 (1932).

[ 163 ]

There is no precedent in this state for depriving a landowner of title to a portion of his land simply because a river suddenly flows over it. Our prior cases, to the extent that they provide any guidance, indicate that the law has been assumed to be otherwise.

In *State Land Board v. Sause,* 217 Or 52, 342 P2d 803 (1959), the issue was the title to a narrow strip of tideland which had been created by the riparian owner, who dredged a perpendicular bank to a more gradual slope with the result that the tide thereafter washed what had originally been part of the upland. The court said that the artificial change in the contour of the bank could be treated as an avulsion, and that if it were an avulsion the state would not acquire title by virtue of the change. This was not the major ground for the decision, but was an alternative holding.

In *Salem Imp. Co. v. McCourt,* 26 Or 93, 106, 41 P 1105 (1894), the court, discussing the significance of an allegation of gradual change in the course of the river, observed:

> "* * * If by any sudden change in the course of the river, the old bed became filled with sand, gravel, and loam, the state was not thereby divested of its legal title * * *."

Although the court was speaking there of the old bed and did not discuss the effect of a sudden change on the title to the new bed, the observation does indicate that the court considered the doctrine of avulsion applicable to questions involving the state's title to river beds.[20]

Litigation involving title to the active beds of navigable rivers is not common in states which have adopted the general rule of public ownership. However, in every such state which follows the common

---

[20] If the state were held to have title to the new bed after an avulsive change, it would not necessarily follow that its title to the abandoned bed would be lost. Nevertheless, most authorities have treated the same rules as determinative of both questions. The court's 1894 statement about the effect of a sudden change in title to the old bed is, therefore, significant.

law and in which this or a related question has arisen, it appears to be held or assumed that an avulsive change in the course of a navigable river does not affect the title to either the old or the new bed.[21] In light of this unanimity of opinion and given the state of our own precedents, if we adopted a contrary rule now our decision would raise serious questions about the taking of private property for public use without compensation. *See Hughes v. Washington,* 389 US 290, 296-98, 88 S Ct 438, 19 L Ed2d 530, 535-36 (1967) (concurring opinion by Stewart, J.).

The state attempts to avoid this problem by arguing that the policy of the state, as expressed by the legislature, has always been to claim title to all of the beds of navigable rivers, whenever and however the beds were formed. The statutes cited do not support that argument.

The earliest, enacted in 1862, authorized the owners of land on navigable streams within the limits of incorporated towns to build wharves out into the river, subject to regulation by the municipalities.[22] The statute is of no particular significance with respect to claims of title because the state, whether it has title or not, has the power to regulate activities affecting the public right of navigation. The statute can be justified

---

[21] *See, e.g., State ex rel Hopkins v. Turner,* 111 Kan 302, 207 P 223 (1922) (state does not become owner of new bed); *Fowler v. Wood,* 73 Kan 511, 85 P 763, app dis'd. 212 US 586 (1906) (same; dictum); *People v. Shasta Pipe & Supply Company,* 264 Cal App2d 520, 70 Cal Rptr 618 (1968) (state does not acquire title to new bed or lose title to old bed; dictum); *State of Iowa v. Carr,* 191 F 257 (8th Cir 1911) (Iowa law; state does not lose title to old bed); *Cooley v. Golden,* 117 Mo 33, 23 SW 100 (1893) (same); *Garrett v. State,* 118 NJ Super 594, 289 A2d 542 (1972) (same); *City of Tulsa v. Commissioners of Land Office,* 187 Okla 82, 101 P2d 246 (1940) (same). *See, generally,* Gould on Waters 315-16 (3d ed 1900).

Some years ago, the Attorney General concluded that this was the law in Oregon:

"If, upon a sudden and violent change of the course of a stream, an owner's land is covered, the title in the bed of the new stream or channel exists as before, and likewise the state's title to the bed of the old stream." 26 Op Atty Gen 167, 168 (1953).

[22] Act of October 17, 1862, now ORS 780.040-.060.

as an exercise of that power and is therefore not necessarily an assertion of title to the river beds.

Subsequent enactments, some of which do appear to assume public ownership of the beds of navigable rivers, do not directly assert ownership over all such beds.[23] We do not believe the legislature's failure to expressly state that these statutes, enacted for a variety of specific purposes, did not apply to river beds which were avulsively formed after statehood indicates an intent to claim public ownership under circumstances where it was never recognized by the common law.

There was no direct statutory claim to title to riverbeds until 1967, when what is now ORS 274.025 (1), which had previously applied only to lakes, was amended to read:

> "The title to the submersible and submerged lands of all navigable streams and lakes in this state now existing or which may have been in existence in 1859 when the state was admitted to the Union, or at any time since admission, and which has not become vested in any person, is vested in the State of Oregon. The State of Oregon is the owner of the submersible and submerged lands of such streams and lakes, and may use and dispose of the same as provided by law." 1967 Or Laws ch 421, § 100.

If defendant had title to Fischer Cut prior to 1967, that amendment did not purport to divest it. The question of what parts of the beds were private property was left open.

■ We hold that in 1909, when this land was submerged by the Willamette River, neither legislation

---

[23] 1874 Or Laws 86, now ORS 780.010-.030 (authorizing entry upon beds of navigable rivers to perform work for improvement of navigation); 1874 Or Laws 76 (since repealed) (granting to adjacent owners title to "overflowed" lands along the Willamette River); 1915 Or Laws ch 24, §§ 1, 2, now ORS 274.530-.600 (authorizing State Land Board to lease beds of navigable streams for removal of sand, rock, and gravel); 1961 Or Laws ch 703, now ORS 274.611-.645 (authorizing lease of navigable river beds for removal of hard minerals).

nor case law in this state had rejected, or suggested the rejection of, the common law rule that an avulsive change in the course of a river has no effect on either boundaries or title to the bed. That rule became a part of the property law of this state. It remains to consider whether the 1909 events which caused Fischer Cut to become the main channel of the river constituted an avulsive change within the meaning of that rule.

The findings of fact establish that prior to 1909 there was a channel or gully through the area known as Fischer Cut. Water flowed in that area at some, but not all, stages of the river. "With great force and violence" the flood of November, 1909, converted that area—which had previously been merely an "overflow channel"—into the bed of the river itself. The trial court specifically found that the change was "rapid and violent." Such a change in the location of the river is avulsive. It is the kind of change which does not result in a change of ownership of the bed.

The state argues also that because the Willamette River is subject to changes of this kind, we ought not to treat them as avulsive, but simply as part of the normal, expected movement of the river. The authorities it cites are not in point. They all involve relatively rapid erosion of or accretion to the river bank along the established bed, not an actual change of course like that involved in this case.[24] We have not found a single instance—whether the issue was a boundary problem or title to the bed—where ownership has been held to be altered by this kind of a change in the course of a river.

---

[24] *Oklahoma v. Texas,* 260 US 606, 636-38, 43 S Ct 221, 67 L Ed 428 (1923); *Arkansas v. Tennessee,* 246 US 158, 173, 38 S Ct 301, 62 L Ed 638 (1918); *Philadelphia Co. v. Stimson,* 223 US 605, 32 S Ct 340, 56 L Ed 570 (1912); *Nebraska v. Iowa,* 143 US 359, 368-70, 12 S Ct 396, 36 L Ed 186 (1892); *Jefferis v. East Omaha Land Co.,* 134 US 178, 190, 10 S Ct 518, 33 L Ed 872 (1890); *Pannell v. Earls,* 252 Ark 385, 483 SW2d 440, 442 (1972); *Wood v. McAlpine,* 85 Kan 657, 118 P 1060, 1065 (1911); *State ex rel Comm'rs v. Warden,* 200 Okla 613, 198 P2d 402 (1943); *Hancock v. Moore,* 135 Tex 619, 146 SW2d 369, 370-71 (1941); *Denny v. Cotton,* 3 Tex Civ App 634, 22 SW 122 (1893).

In summary, we hold that the state has title to all portions of the bed of the Willamette River involved in this case, except that area to which we have referred as Fischer Cut. The Fischer Cut portion of the bed is owned by defendant Corvallis Sand & Gravel.

We have previously held that further proceedings are required in order to determine the exact location of Fischer Cut. As to the remainder of the property involved in this case, the state is entitled to possession and to damages as approved by the Court of Appeals, 18 Or App 524, subject to any adjustments required by our prior determination of the length of Fischer Cut, 272 Or 545.

Remanded to the Court of Appeals with directions to remand to the trial court for further proceedings consistent with this opinion.